In the Matter of Mark C. PAUTLER, Attorney–Respondent.

No. 01SA129.

Supreme Court of Colorado, En Banc.

May 13, 2002.

John Gleason, Attorney Regulation Counsel, Nancy L. Cohen, Chief Deputy Regulation Counsel, Denver, Colorado, Attorneys for Petitioner.

William A. Tuthill, III, Acting Jefferson County Attorney, Ellen G. Wakeman, Assistant County Attorney, Jennifer O. Pielsticker, Assistant County Attorney, Golden, Colorado, Attorneys for Attorney–Respondent.

Ken Salazar, Attorney General, Cheryl Hone, Assistant Attorney General, Appellate Division, Denver, Colorado, Attorneys for Amicus Curiae, for Attorney–Respondent.

Linda R. Johnson, Denver, Colorado, Attorney for Amicus Curiae Colorado Organization for Victim Assistance.

H. Patrick Furman, Boulder, Colorado, Attorney for Amicus Curiae Colorado Criminal Defense Bar.

Colorado District Attorneys Council, Peter A. Weir, Executive Director, Denver, Colorado.

M. Katherine Howard, Deputy District Attorney, Pueblo, Colorado, Attorneys for Amicus Curiae for Attorney–Respondent.

Justice KOURLIS delivered the Opinion of the Court.

> I will employ such means as are consistent with Truth and Honor; I will treat all persons whom I encounter through my practice of law with fairness, courtesy, respect, and honesty.

Oath of Admission—Colorado State Bar, 2002 [1]

In this proceeding we reaffirm that members of our profession must adhere to the highest moral and ethical standards. Those standards apply regardless of motive. Purposeful deception by an attorney licensed in our state is intolerable, even when it is undertaken as a part of attempting to secure the surrender of a murder suspect. A prosecutor may not deceive an unrepresented person by impersonating a public defender. We affirm the hearing board's finding that the district attorney in this case violated the Colorado Rules of Professional Conduct, and on somewhat different grounds, including the attorney's failure to disclose his deception immediately after the event, we also affirm the discipline imposed by the hearing board.

I.

The hearing board found the following facts by clear and convincing evidence: On June 8th, 1998, Chief Deputy District Attorney Mark Pautler arrived at a gruesome crime scene where three women lay murdered. All died from blows to the head with a wood splitting maul. While at the scene ("Chenango apartment"), Pautler learned that three other individuals had contacted the sheriff's department with information about the murders. Pautler drove to the location where those witnesses waited ("Belleview apartment"). Upon arrival, he learned that the killer was William Neal. Neal had apparently abducted the three murder victims one at a time, killing the first two

---

1. The Oath of Admission that Mark Pautler actually took when he was sworn into the Colorado Bar in 1975 read:

"I will ... advance no fact prejudicial to the honor or reputation of a party or witness, unless required by the justice of the cause with which I am charged."

Oath of Admission—Colorado State Bar, 1975

In the intervening years, this court has changed the Oath in a way that more specifically reflects the commitment to the basic precepts of the profession: fairness, courtesy, respect and honesty.

at the Chenango apartment over a three-day period. One of the witnesses at the Belleview apartment, J.D.Y., was the third woman abducted. Neal also took her to the Chenango apartment where he tied her to a bed using eyebolts he had screwed into the floor specifically for that purpose. While J.D.Y. lay spread-eagled on the bed, Neal brought a fourth woman to the Chenango apartment. He taped her mouth shut and tied her to a chair within J.D.Y.'s view. Then, as J.D.Y. watched in horror, Neal split the fourth victim's skull with the maul. That night he raped J.D.Y. at gunpoint.

The following morning, Neal returned with J.D.Y. to the Belleview apartment. First one friend, a female, and then a second friend, a male, arrived at the apartment. Neal held J.D.Y. and her two friends in the Belleview apartment over thirty hours. He dictated the details of his crimes into a recorder. Finally, he abandoned the apartment, leaving instructions with J.D.Y. and her friends · to contact police, and to page him when the police arrived.

When Pautler reached the Belleview apartment, Deputy Sheriff Cheryl Moore had already paged Neal according to the instructions Neal had left. Neal answered the page by phoning the apartment on a cell-phone. The ensuing conversation lasted three-and-a-half hours, during which Moore listened to Neal describe his crimes in detail. She took notes of the conversation and occasionally passed messages to Pautler and other officers at the scene. Sheriff Moore developed a rapport with Neal and continuously encouraged his peaceful surrender. Meanwhile, other law enforcement officers taped the conversation with a hand-held recorder set next to a second phone in the apartment. Efforts to ascertain the location of Neal's cell-phone were unsuccessful.

At one point, Neal made it clear he would not surrender without legal representation; Moore passed a message to that effect to Pautler. Neal first requested an attorney who had represented him previously, Daniel Plattner, but then also requested a public defender (PD). Pautler managed to find Plattner's office number in the apartment telephone book. When he called the number, however, Pautler received a recorded message indicating the telephone was no longer in service. Pautler believed that Plattner had left the practice of law, and he therefore made no additional attempt to contact Plattner. Upon learning that Plattner was unavailable, Sheriff Moore agreed with Neal to secure a public defender. However, no one in the apartment made any attempt to contact a PD or the PD's office.

Pautler later testified that he believed any defense lawyer would advise Neal not to talk with law enforcement. Pautler also testified that he did not trust anyone at the PD's office, although on cross-examination he admitted there was at least one PD he did trust. Law enforcement officials present at the Belleview apartment, testifying in Pautler's defense, said they would not have allowed a defense attorney to speak with Neal because they needed the conversation to continue until they could apprehend Neal. Instead of contacting the PD's office, or otherwise contacting defense counsel, Pautler offered to impersonate a PD, and those law enforcement agents at the scene agreed.

When Neal again requested to speak to an attorney, Sheriff Moore told him that "the PD has just walked in," and that the PD's name was "Mark Palmer," a pseudonym Pautler had chosen for himself. Moore proceeded to brief "Palmer" on the events thus far, with Neal listening over the telephone. Moore then introduced Pautler to Neal as a PD. Pautler took the telephone and engaged Neal in conversation. Neal communicated to Pautler that he sought three guarantees from the sheriff's office before he would surrender: 1) that he would be isolated from other detainees, 2) that he could smoke cigarettes, and 3) that "his lawyer" would be present. To the latter request, Pautler answered, "Right, I'll be present."

Neal also asked, "Now, um, at this point, I want to know, um, what my rights are—you feel my rights are right now." Pautler did not answer the question directly, but asked for clarification. Neal then indicated he sought assurance that the sheriff's office would honor the promises made. Pautler communicated to Neal that he believed the sheriff's department would keep him isolated

as requested. Pautler did not explain to Neal any additional rights, nor did Neal request more information on the topic. In later conversations, it was clear that Neal believed "Mark Palmer" from the PD's office represented him.

Neal eventually surrendered to law enforcement without incident. An officer involved in the arrest approached Pautler with the news that Neal had asked whether his attorney was present. Pautler was at the scene but did not speak with Neal, although he asked the officer to tell Neal that the attorney was indeed present. Evidence at the hearing indicated that Neal was put into a holding cell by himself and received his requested cigarettes as well as a telephone call.

Pautler made no effort to correct his misrepresentations to Neal that evening, nor in the days following. James Aber, head of the Jefferson County Public Defender's office, eventually undertook Neal's defense. Aber only learned of the deception two weeks later when listening to the tapes of the conversation whereupon he recognized Pautler's voice. Aber testified at Pautler's trial that he was confused when Neal initially said that a Mark Palmer already represented him. Aber told the board that he had difficulty establishing a trusting relationship with the defendant after he told Neal that no Mark Palmer existed within the PD's office. Several months later Neal dismissed the PD's office and continued his case pro se, with advisory counsel appointed by the court. Ultimately, Neal was convicted of the murders and received the death penalty. The parties dispute whether Neal dismissed Aber out of the mistrust precipitated by Pautler's earlier deception.

Attorney Regulation Counsel charged Pautler with violating both Colo. RPC 8.4(c) and 4.3 of the Colorado Rules of Professional Conduct ("Rules"). The presiding disciplinary judge granted summary judgment against Pautler on Rule 8.4(c); the 4.3 charge went to a hearing board because the judge ruled that (1) whether Neal was represented, and (2) whether Pautler gave advice, were disputed questions of fact. The board subsequently found that Pautler violated

Rule 4.3. With one dissent, the board set the sanction for both violations at three months suspension, with a stay granted during twelve months of probation. During that period, Pautler was to retake the MPRE, take twenty hours of CLE credits in ethics, have a supervisor present whenever he engaged in any activity implicating Colo. RPC 4.3, and pay the costs of the proceedings.

We take note of additional facts pertinent to our decision here. First, Neal was an unrepresented person at the time Pautler spoke with him; the parties stipulated to this fact after the PDJ's ruling but before Pautler's trial. Second, Pautler is a peace officer, level Ia, as defined in section 18–1–901(3)($l$)(II)(A), 6 C.R.S. (2001), by virtue of his position in the DA's office. As such, Pautler carries a badge and is authorized to carry a weapon. He was armed during these events. He is further authorized to use lethal force, when necessary, to apprehend a dangerous felon. § 18–1–707(2)(a)(I), 6 C.R.S. (2001). Also, all parties acknowledged Pautler's reputation for honesty and high ethical standards. Finally, Pautler testified that given the same circumstance, he would not act differently, apart from informing Neal's defense counsel of the ruse earlier.

## II.

Lawyers, as guardians of the law, play a vital role in the preservation of society. The fulfillment of this role requires an understanding by lawyers of their relationship with and function in our legal system. A consequent obligation of lawyers is to maintain the highest standards of ethical conduct.

Colo. R.P.C. pmbl.

The jokes, cynicism, and falling public confidence related to lawyers and the legal system may signal that we are not living up to our obligation; but, they certainly do not signal that the obligation itself has eroded. For example, the profession itself is engaging in a nation-wide project designed to emphasize that "truthfulness, honesty and candor are the core of the core values of the legal

profession."[2] Lawyers themselves are recognizing that the public perception that lawyers twist words to meet their own goals and pay little attention to the truth, strikes at the very heart of the profession—as well as at the heart of the system of justice. Lawyers serve our system of justice, and if lawyers are dishonest, then there is a perception that the system, too, must be dishonest. Certainly, the reality of such behavior must be abjured so that the perception of it may diminish. With due regard, then, for the gravity of the issues we confront, we turn to the facts of this case.

## III.

For purposes of our decision, "the board's factual findings are binding on this court unless, after considering the record as a whole, the findings are unsupported by substantial evidence." *People v. Bennett*, 810 P.2d 661, 665 (Colo.1991); *see also* C.R.C.P 251.27(b) (mandating a "clearly erroneous" standard of review for findings of fact). Questions of law in attorney disciplinary proceedings receive de novo review as with any appeal. C.R.C.P 251.27(b); *see also People v. Reynolds*, 933 P.2d 1295, 1303 (Colo.1997).

The complaint charged Pautler with violating Colo. RPC 8.4: "It is professional misconduct for a lawyer to: ... (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation." This rule and its commentary are devoid of any exception. Nor do the Rules distinguish lawyers working in law enforcement from other lawyers, apart from additional responsibilities imposed upon prosecutors. *See* Colo. RPC 3.8; *see also Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).[3] The two jurisdictions that have created exceptions to this blanket prohibition limited them to circumstances inapposite here.[4]

### A. Pautler's Defense

We are unpersuaded by Pautler's assertion that his deception of Neal was "justified" under the circumstances, and we underscore the rationale set forth in *People v. Reichman*, 819 P.2d 1035 (Colo.1991). There, a district attorney sought to bolster a police agent's undercover identity by faking the agent's arrest and then filing false charges against him. *Id.* at 1036. The DA failed to notify the court of the scheme. *Id.* We upheld a hearing board's imposition of public censure for the DA's participation in the ploy. *Id.* at 1039.[5]

To support our holding in *Reichman*, we cited *In re Friedman*, 76 Ill.2d 392, 30 Ill. Dec. 288, 392 N.E.2d 1333 (1979). There, a prosecutor instructed two police officers to testify falsely in court in an attempt to collar attorneys involved in bribery. *Friedman*, 30 Ill.Dec. 288, 392 N.E.2d at 1334. A divided Illinois Supreme Court found such advice violated the ethics code despite the undeni-

---

**2.** Professional Reform Initiative project of the National Conference of Bar Presidents, 2001.

**3.** We recall Justice Sutherland's famous rationale behind the heightened ethical standards imposed upon federal prosecutors:

The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use

every legitimate means to bring about a just one.
*Berger*, 295 U.S. at 88, 55 S.Ct. 629.

**4.** Only Utah and Oregon have construed or changed their ethics rules to permit government attorney involvement in undercover investigative operations that involve misrepresentation and deceit. See Utah State Bar Ethics Advisory Opinion Comm., No. 02–05, 3/18/02, and Or. DR 1–102(d), respectively. The recently issued advisory opinion of the Utah Bar Ethics Committee holds that attorneys may participate in "otherwise lawful" government investigative operations without violating the state's ethics rules. *Id.* The Oregon rule is more restrictive. It encompasses similar investigative operations, but limits the attorney's role to "supervising" or "advising," not permitting direct participation by attorneys. *See* Or. DR 1–102(d).

**5.** Reichman violated DR 1–102(A)(4), the identically worded predecessor to Colo. RPC 8.4(c).

ably wholesome motive. *Id.* 30 Ill.Dec. 288, 392 N.E.2d at 1336. Similarly, in *In re Malone,* 105 A.D.2d 455, 480 N.Y.S.2d 603 (N.Y.App.Div.1984), a state attorney instructed a corrections officer, who was an informant in allegations against correctional officers abusing inmates, to lie to an investigative panel. *Id.* at 604–05. The instruction was purportedly to save the testifying officer from retribution by the other corrections officers. *Id.* Again, despite the laudable motive, the New York court upheld Malone's censure for breaking the code. *Id.* at 607–08.

Thus, in *Reichman,* we rejected the same defense to Rule 8.4(c) that Pautler asserts here. We ruled that even a noble motive does not warrant departure from the Rules of Professional Conduct. Moreover, we applied the prohibition against deception a fortiori to prosecutors:

> District attorneys in Colorado owe a very high duty to the public because they are governmental officials holding constitutionally created offices. This court has spoken out strongly against misconduct by public officials who are lawyers. The respondent's responsibility to enforce the laws in his judicial district grants him no license to ignore those laws or the Code of Professional Responsibility.

*Reichman,* 819 P.2d at 1038–39 (citations omitted).

We stress, however, that the reasons behind Pautler's conduct are not inconsequential. In *Reichman,* we also stated, "While the respondent's motives and the erroneous belief of other public prosecutors that the respondent's conduct was ethical do not excuse these violations of the Code of Professional Responsibility, they are mitigating factors to be taken into account in assessing the appropriate discipline." *Id.* at 1039. Hence, *Reichman* unambiguously directs that prosecutors cannot involve themselves in deception, even with selfless motives, lest they run afoul of Rule 8.4(c).

### B. Imminent Public Harm Exception

Pautler requests this court to craft an exception to the Rules for situations constituting a threat of "imminent public harm." In his defense, Pautler elicited the testimony of an elected district attorney from a metropolitan jurisdiction. The attorney testified that during one particularly difficult circumstance, a kidnapper had a gun to the head of a hostage. The DA allowed the kidnapper to hear over the telephone that the DA would not prosecute if the kidnapper released the hostage. The DA, along with everyone else involved, knew the DA's representation was false and that the DA fully intended to prosecute the kidnapper. Pautler analogizes his deceptive conduct to that of the DA in the hostage case and suggests that both cases give cause for an exception to Rule 8.4(c).

We first note that no complaint reached this court alleging that the DA in the kidnapper scenario violated Rule 8.4(c), and therefore, this court made no decision condoning that DA's behavior. But assuming arguendo that the DA acted in conformity with the Rules, one essential fact distinguishes the hostage scenario from Pautler's case: the DA there had no immediately feasible alternative. If the DA did not immediately state that he would not prosecute, the hostage might die. In contrast, here Neal was in the midst of negotiating his surrender to authorities. Neal did make references to his continued ability to kill, which Pautler described as threats, but nothing indicated that any specific person's safety was in imminent danger. More importantly, without second guessing crime scene tactics, we do not believe Pautler's choices were so limited. Pautler had several choices. He had telephone numbers and a telephone and could have called a PD. Indeed, he attempted to contact attorney Plattner, an indication that communicating with a defense attorney was not precluded by the circumstances. Pautler also had the option of exploring with Neal the possibility that no attorney would be called until after he surrendered. While we do not opine, in hindsight, as to which option was best, we are adamant that when presented with choices, at least one of which conforms to the Rules, an attorney must not select an option that involves deceit or mis-

representation.[6] The level of ethical standards to which our profession holds all attorneys, especially prosecutors, leaves no room for deceiving Neal in this manner. Pautler cannot compromise his integrity, and that of our profession, irrespective of the cause.

### C. Duress and Choice of Evils

Pautler further argues that the traditional defenses of duress[7] and "choice of evils"[8] provide examples of appropriate defenses to allegations of ethical misconduct. He also refers the court to the comment after Rule 4.1 where attorneys permissibly "misrepresent" their client's position as part of "generally accepted conventions in negotiations." Colo. RPC 4.1 cmt. Pautler does not assert that any of these exceptions apply in his case, but that their existence demonstrates that exceptions are, at times, available to the otherwise strictly interpreted ethics rules.

■ This court has never examined whether duress or choice of evils can serve as defenses to attorney misconduct.[9] We note that the facts here do not approach those necessary for either defense: Pautler was not acting at the direction of another person who threatened harm (duress), nor did he engage in criminal conduct to avoid imminent public injury (choice of evils).

A review board in Illinois examined a similar scenario and decided against such an exception. *In re Chancey,* No. 91CH348, 1994 WL 929289, at *7 (Ill. Att'y Reg. Disp. Comm'n Apr. 21, 1994). In *Chancey,* a prosecutor with an impeccable reputation drafted a false appellate court order for the sole purpose of deceiving a dangerous felon who had abducted his own child and taken her abroad. *Id.* at **2–4. Chancey signed a retired judge's name to the order. *Id.* at *3. He never intended to file the order and did not file the order, nor was the order ultimately used to deceive the felon. *Id.* Despite its non-use, and despite Chancey's undeniably worthy motive, the Illinois board reprimanded Chancey for his deceit. *Id.* at *7. Rather than consider an exception in light of valid concerns over the safety of an abducted child, the board insisted on holding attorneys, especially prosecutors, to the letter of the Rules. Further, the board observed, and we agree, that motive evidence was only relevant in the punishment phase, as either a mitigating or aggravating factor. *Id.*

Nor does the commentary to Colo. RPC 4.1 persuade us that an exception to Colo. RPC 8.4(c) is appropriate. If anything, the fact that the commentary to Rule 4.1 made explicit an already acknowledged exception demonstrates that, where applicable, the Rules and commentary set forth their own exceptions. Neither Colo. RPC 8.4(c), nor its comment, contain any such exception. On a related point, the hearing board noted, "Both of the rules under which Pautler was charged are imperative, not permissive in application. Compliance with their mandatory provisions is required and is not subject to the exercise of discretion by the lawyer."

### D. Role of Peace Officer

Finally, Pautler contends that this court has never addressed whether district attorneys, "while functioning as peace officers," may employ deception to apprehend sus-

---

6. We do not address whether, under some unique circumstances, an "imminent public harm" exception could ever apply to the Colorado Rules of Professional Conduct. We hold only that this is not such case.

7. Duress is available by statute as a complete defense to criminal charges where the defendant engaged in conduct "at the direction of another person because of the use or threatened use of unlawful force upon him or upon another person" to such degree that a "reasonable person ... would have been unable to resist." § 18–1–708, 6 C.R.S. (2001).

8. "Choice of evils" is a statutory defense applicable when the alleged criminal conduct was "nec-essary as an emergency measure to avoid an imminent public or private injury which [was] about to occur ... and which [was] of sufficient gravity" that it outweighed the criminal conduct. § 18–1–702, 6 C.R.S. (2001).

9. Pautler cites *Montag v. State Bar,* 32 Cal.3d 721, 186 Cal.Rptr. 894, 652 P.2d 1370 (1982), and *Trammell v. Disciplinary Board,* 431 So.2d 1168 (Ala.1983), as examples where other jurisdictions have indicated that duress may be a defense to ethics violations. We note that in neither case did the court find facts sufficient to sustain the defense. While they did not reject the defense outright, the courts ruled that the facts did not warrant its application.

pects. He suggests that because peace officers may employ lethal force when pursuing a fleeing, dangerous felon, it would be absurd to sanction an officer who instead uses artifice, simply because that officer is also a licensed attorney. We disagree.

■ The Rules of Professional Conduct apply to anyone licensed to practice law in Colorado. *See In re C de Baca,* 11 P.3d 426, 429–30 (Colo.2000) (ruling that lawyers must adhere to the Rules of Professional Conduct even when suspended from the practice of law). The Rules speak to the "role" of attorneys in society; however, we do not understand such language as permitting attorneys to move in and out of ethical obligations according to their daily activities. Pautler cites *Higgs v. District Court,* 713 P.2d 840 (Colo.1985), for the proposition that this court has provided a test for distinguishing when prosecutors act as "advocates" and when they act as "investigators," for purposes of governmental immunity. *Id.* at 853. Such test exists, but we hold here that in either role, the Rules of Professional Conduct apply. The obligations concomitant with a license to practice law trump obligations concomitant with a lawyer's other duties, even apprehending criminals. Moreover, this case does not confront us with the propriety of an attorney using deceit instead of lethal force to halt a fleeing felon. We limit our holding to the facts before us. Until a sufficiently compelling scenario presents itself and convinces us our interpretation of Colo. RPC 8.4(c) is too rigid, we stand resolute against any suggestion that licensed attorneys in our state may deceive or lie or misrepresent, regardless of their reasons for doing so.

## IV.

■ The complaint also charges Pautler with violating Rule 4.3:

In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall state that the lawyer is representing a client and shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding. The lawyer shall not give advice to the unrepresented person other than to secure counsel.

Colo. RPC 4.3. This rule targets precisely the conduct in which Pautler engaged. At all times relevant, Pautler represented the People of the State of Colorado.[10] The parties stipulated that Neal was an unrepresented person. Pautler deceived Neal and then took no steps to correct the misunderstanding either at the time of arrest or in the days following. Pautler's failure in this respect was an opportunity lost. Where he could have tempered the negative consequences resulting from the deception, he instead allowed them to linger.

While it is unclear whether Pautler actually gave advice to Neal, he certainly did not inform Neal to retain counsel. In addition, Pautler went further than implying he was disinterested; he purported to represent Neal. Without doubt, Pautler's conduct violated the letter of Colo. RPC 4.3.

For reasons substantially similar to those above, we refuse to graft an exception to this rule that would justify or excuse Pautler's actions. Instead, we affirm the ruling of the hearing board finding a violation of Colo. RPC 4.3 and turn now to consider the sanction imposed.

## V.

The hearing board suspended Pautler for three months and then stayed that suspension during twelve months of probation. During the probationary period, Pautler was to fulfill various conditions including retaking the MPRE. We review this sanction under a reasonableness standard. C.R.C.P 251.27(b).

The board rendered its decision after reviewing the ABA *Standards for Imposing*

---

10. The Colorado Attorney General writing as friend of the court asserted that, during these events, Pautler acted on behalf of the police department "which is not the district attorney's client." This rationale does not comport with sections 20–1–101 to –102, 6 C.R.S. (2001), and we therefore decline to adopt it.

*Lawyer Sanctions* (1991 & Supp.1992) (ABA *Standards* ). Those standards require examination of the duty violated; the lawyer's mental state; the potential or actual injury caused by the lawyer's misconduct; and the existence of aggravating or mitigating factors. ABA *Standards* 3.0.

The board found that Pautler violated duties to the legal system, the profession, and the public. It also ruled that his mental state was "not only knowing, it was intentional." Further, the board found actual injury to the administration of justice in that Pautler's conduct "contributed to a perceived lack of trust between Neal and his lawyers, adversely impacted subsequent judicial proceedings and resulted in additional hearings to explore factual and legal issues created by the deceptive conduct." The board ruled the harm was perhaps unquantifiable, but certainly present. The board also found substantial "potential injury" because, had Neal discovered Pautler's deception, the "negotiating gains made by Sheriff Moore might be lost, Neal could terminate communication and resume or escalate his murderous crime spree." The board also considered the implications of whether Pautler actually became Neal's lawyer.

Addressing mitigating factors, the board acknowledged Pautler's praiseworthy motive, but also found a "secondary" motive: to keep Neal "talking about his crimes without the benefit of requested legal representation and thereby gain an advantage in subsequent legal proceedings." Other mitigating factors included Pautler's full cooperation with the Office of Attorney Regulation, *see* ABA *Standards* 9.32(e), and his lack of prior discipline, *see id.* at 9.32(a). Among the aggravators, the board found Pautler's substantial experience with the law, *see id.* at 9.22(i), and, most importantly, his lack of remorse, *see id.* at 9.22(g). While the board ultimately ruled that the mitigating factors outweighed the aggravating factors, they declined to depart from the presumptive sanction of suspension.

We conclude that the hearing board's discipline was reasonable. Pautler violated a duty he owed the public, the legal system, and the profession. His role of prosecutor makes him an instrument of the legal system, a representative of the system of justice. The fact that he lied for what he thought was a good reason does not obscure the fact that he lied—in an important circumstance and about important facts. To the extent Pautler's misconduct perpetuates the public's misperception of our profession, he breached public and professional trust. *See generally* ABA *Standards* 5.0–7.0.

Second, the record supports the board's finding that Pautler acted intentionally. He intended to deceive Neal into believing not only that the attorney on the telephone was a PD, but that the attorney represented him. Because Pautler's conscious objective was to accomplish the result, his mental state was intentional. *See* ABA *Standards* definitions.

Third, we agree that the evidence before the hearing board supported the finding of actual, unquantifiable harm. We do not agree, however, that the evidence also supported a finding of potential harm.[11]

As to the aggravating factors, we do not find adequate support in the record for the board's finding that Pautler harbored a secondary, ulterior motive. While it is undoubtedly true that Pautler sought to keep Neal on the telephone until he surrendered, no evidence suggested he did so in an effort to gain a tactical advantage in subsequent criminal proceedings. Pautler never attempted to elicit incriminating statements from Neal. Indeed, Neal had already confessed to the crimes in substantial detail, both over the telephone and in the taped confession he left at the Belleview apartment; there was little need for additional evidence. For purposes of aggravation and mitigation, we conclude that Pautler's only motive was Neal's surrender to law enforcement.

---

11. The board weighed the ramifications of Neal's discovering Pautler's deceit and "resuming or escalating his murderous crime spree." We do not view this as "potential harm" under the ABA *Standards.* The record does not suggest that Neal "probably" would have resumed his crime spree due to Pautler's deception, but for some intervening factor. Neal might have continued killing regardless, or he might not have continued even if he discovered Pautler's deception. Hypothetical, worst-case scenarios are not the proper foundation for imposing discipline.

1184

However, we do find an additional aggravating circumstance: Pautler's post-incident conduct. An attorney's post-incident conduct also bears upon aggravation and mitigation. *See* ABA *Standards* 9.22(j) (indifference in making restitution is an aggravating factor); *id.* at 9.32(d) (timely good-faith effort to make restitution or to rectify consequences of misconduct is a mitigating factor). After the immediacy of the events waned, Pautler should have taken steps to correct the blatant deception in which he took part. Instead, he dismissed such responsibility believing that the PD's office "would find that out in discovery." Although we do not agree that Pautler's subsequent failure to correct the deception was evidence of a secondary, ulterior motive, as the hearing board found, we do find that such conduct was an independent aggravating factor.

In mitigation, we credit Pautler's commendable reputation in the legal community, his lack of prior misconduct, and his full cooperation in all these proceedings. In addition, we believe Pautler's motivation to deceive Neal was in no way selfish or self-serving. He believed he was protecting the public.

In light of the various factors bearing on Pautler's discipline, we do not find the hearing board's sanction unreasonable. *See* C.R.C.P. 251.27(b). Other attorneys participating in deceit and misrepresentation have received suspensions. *See, e.g., In the Matter of Gibson,* 991 P.2d 277, 279 (Colo.1999) (ordering thirty-day suspension when attorney deceived client to hide the fact that the attorney had neglected his client's tort claim); *People v. Casey,* 948 P.2d 1014, 1015 (Colo.1997) (affirming forty-five-day suspension when an attorney "represented" a teenager in criminal charges knowing the teen was using an assumed name).

In sum, we agree with the hearing board that deceitful conduct done knowingly or intentionally typically warrants suspension, or even disbarment. *See* ABA *Standards* 7.2 ("Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession ...."); *id.* at 5.11(b) ("Disbarment is generally appropriate when ... a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation...."). We further agree that the mitigating factors present in Pautler's case outweigh the aggravating factors, and affirm the imposition of a three-month suspension, which shall be stayed during twelve months of probation. This sanction reaffirms for all attorneys, as well as the public, that purposeful deception by lawyers is unethical and will not go unpunished. At the same time, it acknowledges Pautler's character and motive.

VI.

Therefore, we affirm the hearing board's ruling that Pautler violated Rules 8.4(c) and 4.3 of the Colorado Rules of Professional Conduct. We also affirm the hearing board's probationary period, with a three-month suspension to be imposed only if Pautler violates the terms of that probation. Finally, Pautler is to pay the costs of this proceeding as ordered by the hearing board.