**The PEOPLE of the State of Colorado, Complainant,**

v.

**Jeffrey A. PARSLEY, Respondent.**

**No. 04PDJ058.**

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

March 10, 2005.

## REPORT, DECISION AND IMPOSITION OF SANCTION PURSUANT TO C.R.C.P. 251.15(b)

On January 13, 2005, the Presiding Disciplinary Judge ("PDJ" or "the Court") conducted a Sanctions Hearing pursuant to C.R.C.P. 251.15(b). Kim E. Ikler appeared on behalf of the Office of Attorney Regulation Counsel ("the People"). Jeffrey A. Parsley ("Respondent") did not appear, nor did counsel appear on his behalf. The Court issues the following Report:

*SANCTION IMPOSED: ATTORNEY DISBARRED*

### I.  *ISSUE*

■ As established by default, Respondent knowingly made material false statements in applying for a loan, and thereby fraudulently received $180,000. Respondent's conduct constitutes a felony under federal and state law. Disbarment is the presumed sanction for a lawyer who commits a serious crime involving dishonesty. As Respondent did not answer the Complaint or participate in the Sanctions Hearing, there is no evidence of mitigation. Under these circumstances, what is the appropriate sanction?

Upon review of the case file, the ABA *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992), and the relevant Colorado Supreme Court case law, the Court finds that disbarment is the appropriate sanction.

## II. *PROCEDURAL HISTORY AND BACKGROUND*

On May 24, 2004, the People initiated this action by filing a Petition for Immediate Suspension. On May 25, 2004, the Court issued a show cause order under C.R.C.P. 251.8, giving Respondent until June 24, 2004 to show cause in writing why he should not be immediately suspended from the practice of law. Respondent filed his response on June 8, 2004, which included a request for a hearing. The Court set the matter for hearing on June 17, 2004. Respondent failed to appear on that date. Thereafter, the Court issued a report pursuant to C.R.C.P. 251.8(b)(2), recommending immediate suspension. After considering this report, the Colorado Supreme Court immediately suspended Respondent from the practice of law in Colorado on June 29, 2004.

On July 6, 2004, the People filed a Citation and Complaint in this matter. On the same day, the People mailed the Citation and Complaint to Respondent at his registered address, 27 Inverness Drive East, Suite 303, Englewood, CO 80112. An agent of Respondent signed for receipt of the certified mail containing the Citation and Complaint on July 7, 2004. On July 12, 2004, the People filed Proof of Service with the Court. Service is therefore proper pursuant to C.R.C.P. 251.32(b).

▆ On September 3, 2004, the People filed a Motion for Default. On October 5, 2005, the Court entered a default on all claims in the Complaint (attached as Exhibit A). Upon entry of default, all facts in the Complaint are deemed admitted and all rule violations in the Complaint are deemed established. *People v. Richards,* 748 P.2d 341 (Colo.1987).

The PDJ then set this matter for a Sanctions Hearing on January 13, 2005. The People sent notice and confirmation of the Sanctions Hearing to Respondent on or about October 14, 2004. Respondent accepted service of the same. Respondent, however, did not appear for the Sanctions Hearing.

## III. *FACTS AND RULE VIOLATIONS*

Respondent has taken and subscribed the oath of admission, was admitted to the bar of this Court on May 17, 1977, and is registered upon the official records of this Court, registration no. 08069. He is therefore subject to the jurisdiction of this Court in these disciplinary proceedings. Respondent's registered business address is 5808 S. Rapp Street, No. 107, Littleton, CO 80120. Respondent's last known business address is 27 Inverness Drive East, Suite 303, Englewood, CO 80112.

▆ The Complaint contains all factual details.[1] In summary, Respondent applied for and received a $180,000 loan from Equity Mortgage based upon fraud and misrepresentation. On July 20, 2001, Respondent executed the loan paperwork, including a Deed of Trust. In doing so, he secured the loan with real property in Boulder County ("the Boulder property" or "the property"). Before and during the loan closing, Respondent represented that he held fee simple title to the property. For example, he prepared a Title Commitment to prove ownership. Respondent, however, did not own the property, and did not have the authority to offer it as security for the loan. Rather, his parents held title to the property, and they had already encumbered it with a "reverse mortgage" in the face amount of $232,875. Respondent did not inform Equity Mortgage of the existing mortgage, and allowed Equity Mortgage to believe it had obtained a first position mortgage. In addition to the Deed of Trust, Respondent executed a number of other fraudulent documents, which he certified to be true and upon which the lender relied in approving the loan. Thus, Respondent received the loan proceeds ($180,000) based upon fraud and misrepresentation.

Respondent knew at the closing that Equity Mortgage planned to sell Respondent's

---

1. Exhibit A.

mortgage to Flagstar Bank, which is insured by the Federal Deposit Insurance Corporation ("FDIC"). Equity Mortgage did so. When Respondent defaulted on the loan, the note holder hired a lawyer to collect the money owed. Upon completion of a title search, the lawyer discovered that the Boulder property did not belong to Respondent. As a result, the lawyer also discovered that the Title Commitment falsely stated that Respondent was vested in fee simple title to the Boulder property. The Complaint alleges and default establishes that Respondent violated 18 U.S.C. § 1014 and C.R.S. § 18–4–401.

These facts constitute professional misconduct on the following grounds: Colo. RPC 8.4(b) (commission of a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects); Colo. RPC 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation); and C.R.C.P. 251.5(b) (conduct which violates the criminal laws of this state or … the United States). While Respondent has not been convicted in a state or federal court for his misconduct, such is not required before addressing these matters in disciplinary proceedings. C.R.C.P. 251.5; *People v. Morley*, 725 P.2d 510, 514 (Colo. 1986) (conviction of criminal offense is not a condition precedent to attorney disciplinary proceedings involving the offense).

## IV. *SANCTIONS*

■ The ABA *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992) ("ABA *Standards*") and Colorado Supreme Court case law are the authorities for selecting and imposing sanctions for lawyer misconduct. The appropriate sanction depends upon the facts and circumstances of each case.

Under ABA *Standard* 5.11 "[d]isbarment is generally appropriate when a lawyer engages in serious criminal conduct a necessary element of which includes … false swearing, misrepresentation, fraud, extortion, misap-

propriation, or theft. . . ." Colorado Supreme Court decisions are in accord with ABA *Standard* 5.11. The Supreme Court stated in *In re DeRose:*

> We have previously held that conduct constituting a felony and evidencing dishonesty may result in disbarment. This is especially true when the conduct is intentional, involves a dishonest motive, and is coupled with previous discipline. *See People v. Chappell*, 927 P.2d 829, 830–31 (Colo.1996) (previously disciplined attorney disbarred for intentionally aiding a client in the violation of a child custody order amounting to a felony); *People v. Viar*, 848 P.2d 934, 936 (Colo.1993) (attorney disbarred for bribery, a class three felony); *People v. Schwartz*, 814 P.2d 793, 794–95 (Colo.1991) (attorney disbarred for conviction of bankruptcy fraud).

55 P.3d 126, 130 (Colo.2002). In *DeRose*, the respondent pled guilty to felony charges after he engaged in structuring financial transactions to evade federal reporting requirements. *Id.* at 127–28.

As set forth in the Complaint and established by default, Respondent committed both federal and state crimes with respect to the loan.[2] In knowingly making false statements to an FDIC-insured institution for the purpose of influencing action on the loan, Respondent violated 18 U.S.C. § 1014. This crime is punishable by a fine of up to $1,000,000 and/or a term of imprisonment up to 30 years. In knowingly obtaining the bank's money by deception, Respondent violated C.R.S. § 18–4–401 (theft), a Class 3 Felony. For disciplinary purposes, the term "serious crime" is defined to include any felony. C.R.C.P. 251.20(e)(1). Therefore, the Court finds that Respondent's conduct constituted serious federal and state crimes. Respondent's conduct also evidenced dishonesty, because his actions involved a conscious effort to deceive.

Accordingly, disbarment is the presumptive sanction for Respondent's misconduct.

---

**2.** The Complaint does not identify the elements of the crimes alleged or relate these elements to Respondent's alleged conduct. However, in judging the sufficiency of the Complaint prior to entering default, *see People v. Richards*, 748 P.2d

341, the Court engaged in its own analysis and found that the facts alleged in the Complaint would support commission of the specified federal and state crimes.

However, disbarment is not mandated. *See e.g. In re Elinoff,* 22 P.3d 60, 61–62 (Colo. 2001) (three-year suspension for the commission of bribery, a Class 3 felony, when the respondent had no prior discipline, no dishonest motive, and made an effort to rectify his conduct). Before determining the appropriate sanction, ABA *Standard* 3.0 directs the Court to examine the following factors:

> (1) the duty violated;
>
> (2) the mental state of the lawyer;
>
> (3) the injury or potential injury caused; and
>
> (4) the aggravating and mitigating evidence.

## A. DUTIES VIOLATED

■ Respondent had a duty to deal honestly and openly with the lender and underwriters on the loan. Instead, Respondent used his imprimatur as a lawyer in good standing [3] to persuade the underwriter that he was a worthy credit risk and that he indeed owned the Boulder property. Attorneys are officers of the court and pledge to uphold the law. Consequently, they must adhere to high moral and ethical standards. *In re Pautler,* 47 P.3d 1175, 1178 (Colo.2002). "If, lawyers are dishonest, then there is a perception that the system must be dishonest. Attorney misconduct perpetuates the public's misperception of the legal profession and breaches the public and professional trust." *DeRose,* 55 P.3d at 131 (paraphrasing *Pautler,* 47 P.3d at 1179).

## B. MENTAL STATE

While no testimony was offered in this regard, the Complaint establishes that prior to Respondent's loan application, he was going through a divorce "resulting in emotional and financial distress and hardship." The Court previously found in its Report re: Petition for Immediate Suspension (entered on June 22, 2004) that Respondent had lost over $200,000 in bad investments and admittedly need more funds to meet his obligations. While these facts provide an explanation for Respondent's actions, they also tend to show that he knowingly deceived the lender to assure loan approval.

## C. INJURY CAUSED

Respondent unquestionably obtained a loan based upon false pretenses. Although Respondent serviced the loan for a little over one year, he then defaulted. Upon Respondent's default, the lender was left with little recourse in recovering its funds, as it could not foreclose on the Boulder property. This fact alone demonstrates serious injury to the lender. Respondent also caused injury to the legal profession, by using his status as a lawyer to obtain the loan on false pretenses and thereby undermining confidence in the profession.

## D. AGGRAVATING AND MITIGATING EVIDENCE

### 1. MATTERS IN AGGRAVATION, ABA *Standard* 9.2

**PRIOR DISCIPLINE**

Respondent has previously been disciplined for attorney misconduct. In 1992, the Supreme Court issued a letter of admonition for neglect of a legal matter with respect to a single client. In 2000, the Supreme Court suspended Respondent for 90 days for neglect of a legal matter, failure to provide competent representation, and conduct prejudicial to the administration of justice with respect to a single client.

**DISHONEST OR SELFISH MOTIVE**

Respondent engaged in a conscious effort to deceive in order to personally benefit from loan proceeds in the amount of $180,000. Respondent applied for and obtained the loan by misrepresenting first that he owned the Boulder property in fee simple and second that the lender would receive a first position mortgage. This conduct was dishonest. Further, Respondent received the proceeds of this loan to meet personal obligations. Thus, Respondent

---

3. *See* Letter from Jeffrey A. Parsley to Stephen Strauber of Equity Financial Services, Inc., attached to the Complaint as Complainant's Exhibit H.

chose to carry out a scheme of misrepresentation for his own monetary benefit.

## SUBSTANTIAL EXPERIENCE IN THE PRACTICE OF LAW

Respondent has been practicing law for nearly 30 years and therefore should be well aware of his professional responsibilities as an attorney. Experience in the law, however, is not required to understand every citizen's obligation to refrain from illegal conduct.

## INDIFFERENCE TO MAKING RESTITUTION

Respondent has not made restitution. Nevertheless, there is no evidence in the record to show that his failure to do so is the result of indifference rather than a lack of ability. Therefore, the PDJ finds no aggravation for this factor.

2. **MATTERS IN MITIGATION, ABA** *Standard* 9.3

Respondent failed to appear for the Sanctions Hearing. As a result, there are no mitigating factors supported by the record.

## V. CONCLUSION

Upon consideration of the duties breached, Respondent's mental state, the injuries caused, the aggravating factors present, and the absence of mitigating factors, the Court concludes that the gravity of Respondent's conduct substantially outweighs any justification for deviation from the presumptive sanction of disbarment.

While the conduct in this case involves a single loan, this was not a simple act of deception. Rather, Respondent engaged in a fairly sophisticated scheme to defraud a lender and thereby obtain a large amount of money (approximately $180,000). It has been established by default that Respondent caused a number of fraudulent documents to be drafted, including a title commitment. Respondent executed his scheme over an extended period of time and involved innocent parties, including his own parents. In addition, Respondent was the only person to benefit from the deception, as he received all the funds disbursed. A number of parties and the financial system as a whole were directly affected by Respondent's actions. Respondent's dire financial position cannot excuse his scheme to defraud or ameliorate the sanction for such conduct.

Although Respondent's actions did not directly concern the practice of law, they harmed a number of parties, as well as the legal profession and respect for the law in general. The rules governing lawyer discipline support disbarment for serious criminal conduct involving false swearing, misrepresentation, fraud, or theft. While Respondent has not been convicted of any offense beyond a reasonable doubt, proof of commission of such a crime by clear and convincing evidence, as established by default, is sufficient for disciplinary purposes. Respondent's breach of integrity is simply unacceptable for a member of the legal profession. The Court therefore finds that disbarment is the appropriate sanction.

## VI. ORDER

It is therefore ORDERED:

1. JEFFREY A. PARSLEY, attorney registration number 08069, is DISBARRED from the practice of law, effective thirty-one (31) days from the date of this Order, and his name shall be stricken from the roll of attorneys licensed to practice law in the State of Colorado.

2. JEFFREY A. PARSLEY is ORDERED to pay the costs of this proceeding; the People shall submit a Statement of Costs within fifteen (15) days of the date of this Order. Respondent shall have ten (10) days within which to respond.

## EXHIBIT A

### COURT USE ONLY

Kim E. Ikeler, # 15590, Assistant Regulation Counsel, John S. Gleason, # 15011, Regulation Counsel, Attorneys for Complainant, 600 17th Street, Suite 200–South, Denver, Colorado 80202.

## COMPLAINT

THIS COMPLAINT is filed pursuant to the authority of C.R.C.P. 251.9 through 251.14, and it is alleged as follows:

### *Jurisdiction*

1. The respondent has taken and subscribed the oath of admission, was admitted to the bar of this court on May 17, 1977, and is registered upon the official records of this court, registration no. 08069. He is subject to the jurisdiction of this court in these disciplinary proceedings. The respondent's registered business address is 5808 S. Rapp St., #107, Littleton, CO 80120. Respondent's last known business address is 27 Inverness Drive E., Suite 303, Englewood, CO 80112.

### *General Allegations*

2. *Background.* In Spring 2001, respondent was going through a divorce, resulting in emotional and financial distress and hardship. He also had lost over $200,000 in bad investments. He needed to obtain funds to meet his obligations.

3. In April 2001, American Title Services Company ("American Title Services") filed its Articles of Incorporation with the Colorado Secretary of State. It listed its address in the same office building where respondent offices. One Richard Talley ("Talley") signed as the incorporator and the registered agent.

4. Respondent knew Talley and did business with him. Respondent and Talley had been partners in a prior real estate venture. This association continued in the new title business. American Title Services for a time operated from respondent's law office and respondent assisted Talley for a time in the title insurance business.

5. *Preparation of False Title Commitment.* In June 2001, someone prepared a title commitment (the "ATGF title commitment") purportedly from Attorneys Title Guaranty Fund, Inc.

("ATGF"), with a supposed effective date of June 15, 2001, and a supposed file number of 07–03–105–01. The ATGF title commitment listed as the proposed insured "Equity Financial Services, Inc." The ATGF title commitment falsely stated that respondent was vested in fee simple title to real property at 892 Ithaca Drive, Boulder, CO. The ATGF title commitment failed to list respondent's parents' encumbrance of that property.

6. Upon information and belief, respondent prepared the ATGF title commitment. Respondent had access to ATGF forms. Respondent was an agent of and had authority to act for ATGF. Respondent admits that he prepared an "unsigned" title commitment, on ATGF forms.

7. Respondent also had access to the signature that appears on the false title commitment. The ATGF title commitment purported to bear the signature of Jim Pamp ("Pamp"). Pamp knows respondent, having formerly shared an office with him. However, Pamp denies that he signed the ATGF title commitment. In an April 18, 2003 letter to Kim Walter, Esq. of ATGF respondent agreed that the signature was not Pamp's.

8. Talley did not authorize preparation of the false title commitment. Talley denies that he authorized respondent to write a title insurance policy for respondent's own loan. Rather, respondent produced the title commitment without Talley's permission.

9. *Transmission of the False Title Commitment.* On July 9, 2001, someone purporting to act for American Title Services transmitted to respondent and Equity Financial Services, Inc. ("Equity Financial") the ATGF title commitment and a tax certificate. Upon information and belief, respondent sent this or directed that it be sent. The fax cover sheet lists American Title Services' address at the same suite as respondent's office address. The fax cover sheet lists respondent's address as 892 Ithaca

Drive, Boulder, CO. The fax trailer on the document includes respondent's fax number and includes the identifier "Parsley & Kranidas". According to respondent's junior partner, Tom Kranidas, the trailer generated by respondent's office fax machine always included the firm name and fax number.

10. *Respondent's Correspondence with the Lender.* On July 17, 2001, using Parsley & Kranidas, P.C. letterhead, respondent wrote to an officer of Equity Financial. Respondent reported that his "primary residence" was at 892 Ithaca Drive, Boulder CO. Respondent stated: "The Ithaca Drive property has been owned by my parents, Claude and Jean Parsley, for approximately 40 years."

11. *Respondent's Misrepresentations at the Loan Closing.* On July 20, 2001, respondent closed a loan from Equity Mortgage Centers of Colorado ("Equity Mortgage"). In order to obtain the loan, respondent made a number of false representations to the lender.

12. On July 20, 2001, respondent executed a Deed of Trust ("Deed of Trust") securing a loan of $180,000 from Equity Mortgage. The Deed of Trust purported to be secured by real property located at 892 Ithaca Drive, Boulder, CO 80303, with a legal description of Lot 7, Block 11, Table Mesa Filing No. 1, County of Boulder, State of Colorado (hereinafter the "property").

13. At the time he executed the Deed of Trust, respondent did not own the property. Instead, the property was in title of respondent's parents, Claude and Jean Parsley. Respondent's parents already had encumbered the property with a "reverse mortgage" in the face amount of $232,875. Respondent did not have his parents' or the prior lender's agreement to encumber the property with a $180,000 first position loan.

14. On July 20, 2001, respondent signed a Borrower's Affidavit. The Borrower's Affidavit lists Equity Mortgage as the lender. The Borrower's Affidavit makes reference to a title commitment from "American Title Services", numbered 07–03–105–01—the same file number that appears on the ATGF title commitment. Respondent misrepresented on the Borrower's Affidavit that he was the owner of the property. The form language in the document states that the borrower (respondent) knows that American Title Services will rely on his statement to issue a title policy.

15. Respondent also signed "Uniform Residential Loan Application", asserting that he was the owner of the property and that it had a value of $332,000. Respondent specifically acknowledged "the loan requested by this application will be secured by a first mortgage or deed of trust on the property described herein". Respondent further acknowledged the lender and its successors and assigns would rely on the information contained in the application. Respondent agreed he had an obligation to amend and/or supplement the information contained in the application if any of the material facts respondent had represented changed prior to closing. Just above his signature, respondent certified:

I/We certify that the information provided in this application is true and correct as of the date set forth opposite my/our signature(s) on this application and acknowledge my/our understanding that any intentional or negligent misrepresentation(s) of the information contained in this application may result in civil liability, and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq. and liability for monetary damages to the Lender, its agents, successors or assigns, insurers and any other person who may suffer any loss due to reliance upon any misrepresentation which I/we have made on this application.

16. Respondent also signed a separate document entitled "Certification", certifying *inter alia* that all the information in his loan application was "true and complete" and that he had "made no

misrepresentation in the loan application or other documents, nor did I/we omit any pertinent information."

17. In fact, respondent did not own the property, was not and could not have been authorized to offer the property as security for the loan, and had omitted to tell the lender that the property was encumbered by a substantial "reverse mortgage".

18. *Other Closing Documents.* Someone purporting to act on behalf of American Title Services issued closing instructions to the escrow company. American Title Services listed its address as the same building and suite number as respondent's office address. The closing instructions make reference to an escrow number of 07–03–105–01, the same number that appears on the ATGF title commitment. A signature purporting to be that of Talley appears above the title "Closing Agent". Talley cannot recall if he signed this document.

19. Someone purporting to act on behalf of American Title Services prepared a Settlement Statement. The Settlement Statement is signed by respondent as the "buyer" and purports to be signed by Talley as the settlement agent. Talley can not recall whether he signed this document; however, he denies having prepared the document. The Settlement Statement shows a charge of $875 due to American Title Services for title insurance. However, Talley denies that American Title Services "booked" these funds. Instead, Talley asserts that American Title Services passed all funds it received through to respondent, because he viewed respondent as the agent for the title insurer and the closing agent on the transaction.

20. *Disbursal.* On July 20, 2001, under letterhead of Flagstar Bank ("Flagstar"), a servicing agent of Equity Mortgage and the assignee of the Deed of Trust, American Title Services provided notice that $180,000 had been disbursed and that the mortgage was a valid first lien on the property, "subject only to those encumbrances shown in Schedule B of the captioned commitment". American Title Services received funds from Flagstar and disbursed them to respondent. Respondent received all of the net loan proceeds.

21. *Assignment of Loan.* Equity Mortgage assigned the Note and Deed of Trust to Flagstar. Flagstar apparently then sold at least the servicing rights.

22. *Default.* In mid–2002, respondent defaulted on his loan. Chase Manhattan Mortgage Corporation ("Chase"), a secondary lender that had purchased at least the servicing rights to the loan, hired the law firm of Meinhold, Stawiarski, Shapiro & Codilis (the "Meinhold firm") to foreclose.

23. The Meinhold firm conducted a title search as a preparation for foreclosure. The firm discovered that the land records did not confirm respondent in title to the property, as reported on the title commitment. The Meinhold firm also discovered the reverse mortgage, which was prior to the Deed of Trust. In March 2003, the Meinhold firm wrote to ATGF inquiring of this.

24. *ATGF Investigation.* ATGF conducted an investigation, including by contacting Pamp and respondent. ATGF's general counsel, R. Kymn Walter, confronted respondent with the fact that the ATGF title commitment shows respondent in title when he is not and fails to disclose the prior encumbrance. Respondent claimed not to know "why ATGF was involved." Respondent told Mr. Walter that the loan had closed at American Title Services and that the underwriter had been Title Insurance Company of America. However, when Mr. Walter called that title company to inquire about the title commitment, the company denied any knowledge of the loan.

25. On April 21, 2003, Mr. Walter wrote back to the Meinhold firm denying any liability on the ATGF title commitment.

26. *Additional Investigation by Meinhold Firm.* Mr. Meinhold spoke with respondent. Respondent agreed the

signature on the ATGF title commitment was not Pamp's. Respondent stated that American Title Services had closed the loan. Respondent claimed to have a deed from his parent to him, which he promised to send to Mr. Meinhold. Respondent never did so.

27. Lynn Janeway, Esq. of the Meinhold firm also spoke with respondent. Respondent admitted that his mother owned the property (his father having passed away). Respondent claimed to have no relationship with American Title Services, even though American Title Services shared the same office suite with respondent and used the same fax number. Respondent admitted signing the Deed of Trust knowing he did not own the property.

### CLAIM I

**(It Is Professional Misconduct for a Lawyer to Commit a Criminal Act that Reflects Adversely on the Lawyer's Honesty, Trustworthiness, or Fitness as a Lawyer in Other Respects—Colo. RPC 8.4(b) and C.R.C.P. 251.5(b))**

28. Paragraphs 1 through 27 are incorporated herein as if fully set forth.

29. Colo. RPC 8.4(b) provides that it is professional misconduct for a lawyer to commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects.

30. C.R.C.P. 251.5(b) provides an attorney engages in misconduct by committing any act or omission that violates the criminal laws of the State of Colorado.

31. *Violation of 18 U.S.C. § 1014.* By signing the Uniform Residential Loan Application, respondent stated his understanding that "it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq." 18 U.S.C. § 1001 provides:

Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—

falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

makes any materially false, fictitious, or fraudulent statement or representation; or

makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

shall be fined under this title or imprisoned not more than 5 years, or both.

32. By signing the Certification, respondent stated his understanding that "it is a Federal crime punishable by fine or imprisonment or both, to knowingly make any false statements when applying for this mortgage, as applicable under the provisions of Title 18, United States Code, Section 1014." 18 U.S.C. § 1014 provides in pertinent part:

Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of ... any institution the accounts of which are insured by the Federal Deposit Insurance Corporation ... upon any application, ... commitment, or loan, ... or the acceptance ... of security therefor, shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

33. Respondent knew that Equity Mortgage would be selling his mortgage to a successor. Respondent acknowledged this, for example, by signing the Certification, which includes, under the title "Authorization to Release Information", a release of respondent's credit information to any investor to whom Equity Mortgage sells the mortgage. Similarly, the "Acknowledgement and Agreement" section of the Uniform Residential Loan Application states that the lender, its agents, successors and assigns will rely on the information therein.

34. In particular, respondent knew that Equity Mortgage would be selling his mortgage to Flagstar. Closing documents state that the loan number is 998390168–FLAG, a Flagstar loan number. The Deed of Trust which respondent executed bears this loan number. So does the Settlement Statement. So does the Note, which also contains an endorsement from Equity Mortgage to "Flagstar Bank, FSB" dated July 20, 2001, the date of the closing. This endorsement is on the same page as respondent's signature. Another closing document, entitled "Hazard Insurance Notification" and dated July 20, 2001, directs the insurer of the supposedly mortgaged property to amend the mortgagee clause in the insurance policy to reflect that "Flagstar Bank, FSB, its successors and/or assigns" is now the mortgagee. Closing instructions to the escrow company state that "Flagstar Bank, FSB" is the investor.

35. Flagstar is insured by the Federal Deposit Insurance Corporation ("FDIC"). By making false statements concerning ownership and encumbrance of the property in the Uniform Residential Loan Application and related closing documents, respondent intended to induce Flagstar to lend $180,000 to him through Equity Mortgage. Respondent violated 18 U.S.C. § 1014.

36. *Violation of C.R.S. § 18–4–401.* C.R.S. § 18–4–401(1) provides in pertinent part:

A person commits theft when he knowingly obtains or exercises control over anything of value of another without authorization, or by threat or deception, and:

Intends to deprive the other person permanently of the use or benefit of the thing of value; or

Knowingly uses, conceals, or abandons the thing of value in such manner as to deprive the other person permanently of its use or benefit; or

Uses, conceals, or abandons the thing of value intending that such use, conceal-ment, or abandonment will deprive the other person permanently of its use and benefit; . . . .

Theft of more than $15,000 is a class 3 felony.

37. Respondent committed theft when he induced Equity Mortgage and its investor, Flagstar, to lend him $180,000 by falsely pretending that he owned the property and that the property was free and clear of liens. Respondent violated C.R.S. § 18–4–401.

38. In particular, respondent deceived Stephen Strauber, the broker who initiated the $180,000 loan. The information in the Uniform Residential Loan Application, discussed above, was taken by an employee of Equity Mortgage, Stephen Strauber, who is identified on the Application as the "interviewer". Among the information taken by Mr. Strauber and included in the Application is the representation that respondent owned the property. Respondent told Mr. Strauber that respondent's parents had quit-claimed the property to him. This was false. The information in the Application does not include the fact that there is an encumbrance on the property. Instead the Application represents that there are no liens on the property. Respondent told Mr. Strauber that there were no liens against the property. Mr. Strauber also reviewed the phony title commitment that respondent provided, which indicated there were no encumbrances. Mr. Strauber would not have included and omitted information in the Uniform Residential Loan Application unless he had been given that information by respondent or respondent had omitted that information. Respondent deceived Mr. Strauber into facilitating the $180,000 loan, and thereby committed theft.

39. By violating 18 U.S.C. § 1014 and C.R.S. § 18–4–401, respondent violated Colo. RPC 8.4(b) and C.R.C.P. 251.5(b).

WHEREFORE, the complainant prays at the conclusion hereof.

## CLAIM II

[A Lawyer Shall Not Engage In Conduct Involving Dishonesty, Fraud, Deceit Or Misrepresentation (Knowing Conversion)Colo. RPC 8.4(c) ]

40. Paragraphs 1 through 27 are incorporated herein.

41. Colo. RPC 8.4(c) provides that it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

42. As shown above, respondent prepared the ATGF title commitment. The commitment was fraudulent, *inter alia,* in that it stated that respondent was in fee title to the property. Respondent was never the owner of the property.

43. In addition, as discussed above, the ATGF title commitment did not list as an exception the encumbrance of respondent's parents' reverse mortgage. Rather, the title commitment gives the impression there is no such encumbrance. Respondent intended to use the ATGF title commitment to commit fraud.

44. As noted above, on July 9, 2001, someone purporting to act on behalf of American Title Services transmitted by fax the ATGF title commitment to Equity Financial. This is shown by the fax trailer on the nine-page fax that includes the title commitment. The fax trailer shows a date and time for transmission of "07/09/2001 10:19". The fax trailer also lists respondent's fax number and includes the identifier "Parsley & Kranidas", evidence that the fax originated from respondent's office.

45. On the July 9, 2001 fax transmittal, American Title Services lists as an office address the same building and suite as respondent's office and the same fax number as respondent. Talley, the principal of ATGF, denies any pre-closing involvement in this transaction. As a result, it must have been respondent or someone in respondent's employ at his direction who faxed the ATGF title commitment to the lender.

46. By preparing the ATGF title commitment, transmitting it or causing it to be transmitted to the lender, and then closing the loan based on the fraudulent title commitment, respondent obtained the lender's funds under false pretenses.

47. Respondent also engaged in fraud at the closing. Respondent effectively confesses this by admitting, in his response to the request for investigation: "At closing, I became aware that, due to some oversight by Equity Mortgage, funds were not being withheld to pay off the first mortgage. Due to my pressing financial needs, I did allow the closing to proceed."

48. Respondent should have told the lender of the prior encumbrance on his parents' property at the closing. Instead, he took the funds knowing the lender would be effectively unsecured.

49. The foregoing conduct of the respondent establishes grounds for discipline as provided for in C.R.C.P. 251.5 and violates Colo. RPC 8.4(c).

WHEREFORE, the people pray that the respondent be found to have engaged in misconduct under C.R.C.P. 251.5 and the Colorado Rules of Professional Conduct as specified above; the respondent be appropriately disciplined for such misconduct; the respondent be required to make restitution; the respondent be required to take any other remedial action appropriate under the circumstances; and the respondent be assessed the costs of this proceeding.

DATED this ____ day of July, 2004.

Respectfully submitted,

Kim E. Ikeler, # 15590
Assistant Regulation Counsel
John S. Gleason, # 15011
Regulation Counsel
Attorneys for Complainant