**The PEOPLE of the State of Colorado, Complainant,**

v.

**Daniel R. ROSEN, Respondent.**

**No. 07PDJ015.**

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

Nov. 21, 2007.

**OPINION AND ORDER IMPOSING
SANCTIONS PURSUANT TO
C.R.C.P. 251.19**

### I. *ISSUE*

Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession, and causes injury or potential injury to a client, the public, or the legal system. In an attempt to settle an injury claim for his client, Respondent failed to advise an insurance company of his client's death. Did such conduct potentially injure the legal profession and legal system?

### II. *SUMMARY*

The Hearing Board concludes the evidence is clear and convincing that Respondent acted dishonestly and deceitfully in his negotiations with Safeco Insurance Company as alleged in Claims One through Five. However, the Hearing Board finds the evidence falls short of clear or convincing that Respondent committed the felony of attempted theft as alleged in Claim Six.

> *SANCTION IMPOSED:* **ATTORNEY SUSPENDED FOR SIX (6) MONTHS, ALL STAYED ON THE SUCCESSFUL COMPLETION OF A SIX (6) MONTH PERIOD OF PROBATION WITH CONDITIONS.**

### III. *PROCEDURAL HISTORY AND BACKGROUND*

On February 22, 2007, the People filed their Complaint in this matter and Respondent filed his answer on April 6, 2007. The complaint contained six claims for relief based upon Respondent's alleged dishonesty and deceit in representing a client in a personal injury claim arising out of an accident caused by a party insured by Safeco Insurance Company ("Safeco").

At the conclusion of the evidence, the People argued that Respondent attempted theft from Safeco of settlement funds, which included $9,000.00 for pain and suffering, a claim that Respondent knew was not available under Colorado law, and that his conduct warrants disbarment. ABA *Standard* 5.11.

Respondent argued that the People failed to establish clear and convincing evidence that he intended to permanently deprive Safeco of funds belonging to them. Further, Respondent argued that the substantially admitted misrepresentations alleged in Claims One through Five all arose out of a single episode and should not be treated as sepa-

rate acts of dishonesty. Respondent therefore argues that a public censure is most appropriate under ABA *Standard* 5.13.

## IV. FINDINGS OF MATERIAL FACT

The Hearing Board considered the testimony of each witness and exhibit admitted into evidence, and finds the following material facts established by clear and convincing evidence.[1]

### Background

Respondent has taken and subscribed the Oath of Admission, was admitted to the Bar of the State of Colorado on October 17, 1996, and is registered as an attorney upon the official records of the Colorado Supreme Court, Attorney Registration No. 27000. He is therefore subject to the jurisdiction of the Colorado Supreme Court and the Office of the Presiding Disciplinary Judge in these proceedings. Respondent's business address is 8310 South Valley Highway, Suite 210, Englewood, Colorado 80112.

Respondent is a solo practitioner who has practiced law for twenty-five years in Florida and for the last eleven years in Colorado. His legal practice is a high-volume personal injury practice, in which he utilizes paralegals and form letters in communicating with insurance companies.

### David Bourelle Hires Respondent

In January 2004, David Bourelle ("Bourelle") suffered injuries in an automobile accident. In February 2004, Bourelle hired Respondent on a contingent fee basis to represent him in a potential lawsuit arising from his injuries. Bourelle reported head, knee, and neck injuries following the accident. Safeco had insured the at-fault driver who allegedly caused Bourelle's injuries. After taking Bourelle's case, Respondent worked with him and his medical providers to obtain care for the injuries and determine when he reached maximum medical improvement. However, by October 2004, Bourelle informed Respondent that he no longer wanted further treatment. Instead, he wanted to settle the dispute with Safeco and its at-fault driver.

Based upon his client's direction to settle the case, Respondent prepared a settlement demand. However, Respondent chose not to immediately send the settlement demand to Safeco, because he was seeking additional documents, and because of the holiday season.

### Respondent Notified of David Bourelle's Death

On February 18, 2005, Bourelle's brother notified Respondent's office by telephone that Bourelle had died from a medical condition unrelated to the automobile accident. The same day, one of Respondent's employees sent an electronic message from the case management system to Respondent, which stated as follows:

> David's (Bourelle's) brother called today and said that he died on 2/8/05 after a recent surgery on his kidneys and liver. *His father is the executor of his estate* and they would like to know what they need to do to close out his case etc—Please advise JoAnn [2]

On February 21 and 22, 2005, Respondent wrote to a member of his staff that he needed to see the file on the Bourelle case and discuss it.[3]

Up to this time in Respondent's career, he testified that he never had a client die while in the process of settling a claim with an insurance company. Further, Respondent was unaware of the effect that the death of a client had on the attorney-client relationship and the need to disclose the client's death to the insurance company. He was also unaware of its effect on a client's continued right to collect damages, specifically, damages for pain and suffering.

---

1. The parties provided the Court with a stipulation of facts. The Hearing Board adopts and incorporates this stipulation into its findings.

2. *See* Exhibits 3 and 4 (emphasis added).

3. *See* Exhibit 4.

### Respondent Sends Settlement Demand Without Disclosing Death

On February 25, 2005, Respondent sent a written settlement demand to Safeco.[4] In this letter, Respondent outlined his client's injuries, the doctors who provided treatment, and the results of tests, as well as the special damages suffered by his client. Respondent specifically wrote:

It is Dr. Nadler's opinion that my client has been left with a 6% to 7% impairment of the body as a whole, as a whole, as a result of this L4–5 disc herniation. In addition, the doctor recommends that he avoid lifting more than 20 pounds, as well as repetitive bending.

Respondent demanded a settlement of $65,000.00 on behalf of his client. At the time Respondent wrote this letter, he was aware that his client had died, but he failed to disclose this fact to Safeco.

### Safeco Offers to Settle the Case

On or about April 12, 2005, a representative of Safeco called Respondent's office and spoke with one of his employees. During this conversation, Safeco made a counteroffer of settlement for $23,000.00, which specifically included nearly $9,000.00 for pain and suffering. Respondent's employee forwarded this counteroffer to Respondent via electronic mail.[5]

On April 25, 2005, Respondent wrote another letter to Safeco.[6] In this letter, Respondent stated that Bourelle needed *additional medical treatment*. Respondent rejected Safeco's offer to settle for $23,000.00, but reduced his demand from $60,000.00 to $50,000.00.

### Respondent Advised Pain and Suffering Claim Abated upon Death

On or about April 28 or 29, 2005, Respondent spoke with attorney Greg Gold about the Bourelle case. Respondent often worked with Mr. Gold, a trial attorney, on cases that he was unable to settle. Respondent respected Mr. Gold's counsel and judgment. After Respondent described the Bourelle case, Mr. Gold advised him that the claim for pain and suffering abated when Bourelle died, under Colorado law.[7] The parties stipulated that this was *the first time* that Respondent realized Bourelle's death affected the claim for damages, specifically the damages for pain and suffering.[8]

After learning that he could not claim damages for pain and suffering on behalf of a deceased client, Respondent received a letter from Safeco, which included an offer to settle the Bourelle matter for $31,765.00.[9] This settlement offer did not specifically detail what part of the $31,765.00 offer, if any, represented damages for pain and suffering. Safeco's letter also included a release from liability for Bourelle to sign upon his acceptance of Safeco's check in the amount of $31,765.00 sent under separate cover. Respondent never negotiated the settlement check, but instead kept it in his office.

After receiving the check from Safeco, a paralegal from Respondent's office sent a fax on or about July 25, 2005, to Bourelle's brother, Mark, in California enclosing the release from liability that Safeco sent to Respondent and a "closing settlement statement" prepared by Respondent's office.[10] In the closing settlement statement, the client received $12,579.29 as his net payment after subtracting advanced costs, medical expenses, and attorney's fees of one-third.

After receiving the settlement statement and release on July 25, 2005, Mark Bourelle called Respondent's office. He spoke with a member of Respondent's staff about the release. Mark Bourelle and his family ques-

---

**4.** *See* Exhibit 7.

**5.** *See* Exhibit 8.

**6.** *See* Exhibit 9.

**7.** C.R.S.A. § 13–20–101

**8.** *See* Exhibit 11.

**9.** *See* Exhibit 15.

**10.** *See* Exhibit 16. The Hearing Board notes that Exhibit 16, as originally tendered, included a release for $14,187.07. The parties later tendered a separate document that should have been tendered, a release based upon a check in the amount of $31,765.00.

tioned whether it would be proper for them to sign the release for Bourelle. As a result of their concern, Mark Bourelle contacted Safeco and advised them that Respondent had provided them with the release and had asked them to sign it. Neither Mark Bourelle nor Safeco advised Respondent of this call. Furthermore, there is no evidence that Respondent otherwise learned of Mark Bourelle's call to Safeco.

The parties stipulate that *shortly after* sending the "closing settlement statement" to Mark Bourelle, Respondent formed a belief that Bourelle's family was not taking action to probate his estate, either formally or informally, Bourelle's father was not acting as the executor of the estate, the family had not and apparently could not reach an agreement as to the disposition of the estate, and as a result, Bourelle's father was not in a position to sign the release on behalf of the estate as he earlier understood was the case. At that point, Respondent considered commencing a probate action in Colorado.

On August 11, 2005, nearly three weeks after Mark Bourelle called Safeco, Respondent sent a letter to Safeco informing them for the first time that Bourelle had died. Respondent also wrote that he would hold the settlement check until a probate estate was set up in Colorado and a personal representative had been appointed for his deceased client.[11] In this letter, however, Respondent indicated that Bourelle had died "subsequent" to the settlement reached with Safeco. This statement was not true and Respondent was aware that it was not true. Safeco never answered Respondent's letter dated August 11, 2005. Shortly thereafter, however, Safeco commenced an investigation of Respondent's conduct in the settlement of Bourelle's claim.

On November 7, 2005, Respondent's paralegal sent Respondent a message on his electronic case management system stating that an investigator from Safeco wanted to interview Respondent and the paralegal who prepared certain correspondence in the Bourelle settlement negotiations.[12] However, Respondent would not agree to meet with Safeco's investigator. This is the first time that Respondent or his office knew of an investigation by Safeco into the Bourelle matter.

On November 10, 2005, Respondent sent another letter to Safeco.[13] In this letter, Respondent wrote that he had "recently" learned that his client passed away on February 8, 2005. This statement was not true and Respondent was aware that it was not true. Respondent also inquired of Safeco as to how they would like to proceed with the settlement and that he still held the check in anticipation that an estate would be set up by the Bourelle family. Again, for some time, Safeco never responded to Respondent.

On February 15, 2006, Safeco requested the return of the settlement funds and Respondent sent them back on February 16, 2006. Safeco ultimately agreed to settle the case for $14,187.07.[14]

Safeco's investigator attempted to obtain a statement from Respondent, but he refused when Safeco's investigator refused to state the purpose of the investigation.[15]

## V. CONCLUSIONS OF LAW—SUBSTANTIVE ALLEGATIONS

The Hearing Board finds clear and convincing evidence that Respondent violated the following rules of professional conduct as alleged in the Complaint:

- **First Claim,** Colo. R.P.C. 8.4(c) and 4.1(a) for failing to advise Safeco of his client's death upon receiving notice from Mark Bourelle.[16]

11. *See* Exhibits 18 and 20. On October 28, 2005, someone entered a comment in Respondent's electronic case management system that stated, "LM for Sandra (Bourelle) telling her that Virginia (Frazer—Abel) would be calling regarding setting up the estate."

12. *See* Exhibit 22.

13. *See* Exhibit 23.

14. *See* Exhibit 25.

15. *See* Exhibit 20.

16. The Hearing Board notes that at the time these events occurred, Colo. R.P.C. 4.1 did not require that the statements be material. The new rule, effective January 1, 2008, adds the element of materiality to this rule.

- **Second Claim,** Colo. R.P.C. 8.4(c) and 4.1(a) for writing a letter to Safeco, which stated his client "is" suffering from permanent injuries as a result of the negligence of Safeco's insured. At the time Respondent wrote this letter, he was aware that Bourelle was dead. This letter is deceitful in that it infers that Bourelle was currently suffering from injuries arising out of the accident with Safeco's insured.

- **Third Claim,** Colo. R.P.C. 8.4(c) and 4.1(a) for writing a letter to Safeco, which stated his client "is" in need of additional medical treatment. Again, at the time Respondent wrote this letter he was aware of his client's death and the statement is therefore deceitful.

- **Fourth Claim,** Colo. R.P.C. 8.4(c) and 4.1(a) for writing a letter to Safeco, which stated that "subsequent" to a settlement Respondent and Safeco reached, Bourelle had died. This statement was not true.

- **Fifth Claim,** Colo. R.P.C. 8.4(c) and 4.1(a) for writing a letter to Safeco, which stated that he did not have knowledge of the date of his client's death until "recently." This statement was misleading. Respondent's letter was written on or about November 10, 2005, nearly ten months after Mark Bourelle advised Respondent of his brother's death.

- **Sixth Claim,** Colo. R.P.C. 8.4(b) and Colo. R.C.P. 251.5(b) alleged attempted felony theft in violation of the criminal law of Colorado. The People's theory of the case is that Respondent attempted to steal money belonging to Safeco; that is the sum of $9,000.00, which represented the amount that Safeco estimated for pain and suffering and was included in the $31,765.00 check Safeco tendered to Respondent following their negotiations.

Colo. R.P.C. 8.4(b) states that it is professional misconduct *to commit a criminal act,* which adversely reflects on the law-

yer's honesty and trustworthiness. There is no question that Respondent acted deceitfully in initially failing to disclose his client's death to Safeco and in concealing this fact in later correspondence with them. However, this evidence alone falls short of proving the crime of attempted theft. In order to prove attempted theft, the People must prove each and every one of the following elements by clear and convincing evidence: [17]

- That Respondent;
- In the State of Colorado;
- Knowingly;
  - Exercised control over
  - Anything of value
  - Which was the property of another
- By deception; and
- With the intent to permanently deprive the other of the use or benefit of the thing of value.

The essential elements of *attempted theft* are that Respondent, acting with the specific intent to permanently deprive Safeco of a thing of value, engaged in conduct which is strongly corroborative of the firmness of his purpose to complete the crime of theft. *See* C.R.S. § 18–2–101(1). After carefully reviewing all of the evidence, including Respondent's testimony on the issue of intent to permanently deprive, the Hearing Board finds the People failed to meet their burden. We need not therefore address the issue of the affirmative defense of abandonment Respondent raised in these proceedings.[18]

## VI. SANCTIONS

The American Bar Association *Standards for Imposing Lawyer Sanctions* (1991 & Supp. 1992) ("ABA *Standards* ") and Colorado Supreme Court case law are the guiding authorities for selecting and imposing sanctions for lawyer misconduct. The appropri-

---

17. *See* CO–JICRIM 16:01.

18. Respondent argues that even if the People proved attempted theft, he abandoned any such effort when he advised Safeco that his client was deceased. The People argue that it is Respon-

dent's burden to prove by clear and convincing evidence that he abandoned any effort to commit theft and absent any motivation to do so based upon the circumstances, which increases the probability of detection.

ate sanction depends upon the facts and circumstances of each case.

### Analysis Under the ABA Standards

ABA *Standards* 7.2 deals with a lawyer's violation of duties owed to the profession. It specifically provides:

Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession, and causes injury or potential injury to the public or the legal system.

However, before imposing a sanction after a finding of lawyer misconduct, ABA *Standard* 3.0 directs the Hearing Board to first consider the following factors to determine whether the presumed sanction is appropriate:

(1) the duty violated;

(2) the lawyer's mental state;

(3) the actual or potential injury caused by the misconduct; and

(4) the existence of aggravating or mitigating factors.

### A. THE DUTY VIOLATED

Respondent violated his duty as an attorney to the legal profession to act with candor as a representative of the profession.

### B. THE LAWYER'S MENTAL STATE

Respondent was aware of his conduct and the attendant circumstances; that is, he knew that his client had died; yet he failed to advise Safeco. Nevertheless, the evidence is insufficient to conclude that Respondent acted with the conscious objective of committing theft or attempted theft as alleged in Claim Six.

### C. THE ACTUAL OR POTENTIAL INJURY

Respondent caused injury to the legal profession. When a lawyer fails to act with candor, his lack of integrity affects the profession and the fair and reasonable administration of justice. While Respondent's actions took place outside the context of a formal proceeding before a court, they nevertheless potentially injured the profession and the legal system by eroding trust in a lawyer's word.

### D. AGGRAVATING AND MITIGATING FACTORS

#### 1. MATTERS IN AGGRAVATION, ABA STANDARD 9.2

The Hearing Board considered evidence of the following aggravating circumstances in deciding the appropriate sanction.

#### Dishonest Motive—9.22(b)

Respondent acted with a dishonest motive in his negotiations with Safeco. He did not tell them his client had died and thereafter exacerbated his initial dishonesty by continuing to lead Safeco to believe his client was still alive for nearly nine months.

#### A Pattern of Misconduct—9.22(c)

The record is clear that Respondent engaged in multiple misrepresentations and that this was a pattern of misconduct.

#### Substantial Experience in the Practice of Law—9.22(i)

Respondent has practiced law for over twenty years as a personal injury lawyer who specializes in settling cases before formal litigation.

#### 2. MATTERS IN MITIGATION, ABA STANDARD 9.3

The Hearing Board considered evidence of the following mitigating circumstances in deciding the appropriate sanction.

#### Absence of a Prior Disciplinary Record—9.32(a)

Respondent practiced nearly twenty-five years without a prior disciplinary record. The Hearing Board found this to be a significant mitigating factor.

#### Timely good faith effort to rectify consequences of misconduct—9.32(d)

While Respondent initially deceived Safeco, albeit late, he disclosed his lack of candor to Safeco and returned their check.

**Full disclose and a cooperative attitude toward the proceedings—9.32(e)**

Respondent supplied the People with all of his records and cooperated in the investigation of this matter as well as the hearing.

**Remorse—9.32(m)**

Respondent testified in these proceedings and expressed remorse for his actions in dealing with Safeco. The Hearing Board finds that Respondent's expression of remorse is genuine.

### Analysis Under Case Law and ABA Standards

Respondent's counsel correctly points out that the facts presented in this matter are of first impression in Colorado. But while this case presents an issue of first impression in Colorado, the ABA Standing Committee on Ethics and Professional Responsibility issued a formal opinion in 1995, which clearly addresses a lawyer's duty to disclose the death of his client in these circumstances. The "general rule" is that the death of a client terminates the relationship of the lawyer and client and, therefore, the lawyer may not take further steps in connection with the representation pending authorization from the duly authorized personal representative of the deceased client. *See* ABA Formal Opinion 95–397.

But the more egregious issue concerns Respondent's continued pattern of deceit. Even after he became aware that his deceased client could not obtain damages for pain and suffering, Respondent continued to press the settlement without advising the insurance company of his client's death and leading them to believe that his client was still alive.

### VII. CONCLUSION

A lawyer's word should be his or her bond. As Justice Kourlis stated in *In re Pautler* 47 P.3d 1175, 1178–79 (Colo.2002):

The jokes, cynicism, and falling public confidence related to lawyers and the legal system may signal that we are not living

up to our obligation; but, they certainly do not signal that the obligation itself has eroded. For example, the profession itself is engaging in a nation-wide project designed to emphasize that "truthfulness, honesty and candor are the core of the core values of the legal profession." Lawyers themselves are recognizing that the public perception that lawyers twist words to meet their own goals and pay little attention to the truth, strikes at the very heart of the profession as well as at the heart of the system of justice. Lawyers serve our system of justice, and if lawyers are dishonest, then there is a perception that the system, too, must be dishonest. Certainly, the reality of such behavior must be abjured so that the perception of it may diminish.

On a core issue, Respondent engaged in misleading and dishonest correspondence with Safeco for over six months. His conduct falls below the standards of honesty and integrity that the public expects and deserves from its legal representatives. The Hearing Board agrees with Respondent's counsel that Respondent made *a mistake* in not understanding that he could no longer represent his client, once Bourelle died. However, it was more than mistake or misjudgment on Respondent's part to continue to deceive Safeco after he learned of his client's death and its impact on settling the claim. Such actions were knowingly deceitful.

### VIII. ORDER

The Hearing Board therefore **ORDERS:**

1. **DANIEL R. ROSEN,** Attorney Registration No. 27000, is hereby **SUSPENDED** from the practice of law for a period of **SIX (6) MONTHS, ALL STAYED** upon the successful completion of a **SIX (6) MONTH PERIOD OF PROBATION,** with the condition that that he complete the Ethics School sponsored by the Office of Attorney Regulation Counsel within six (6) months of the date of this order. The effective date of Re-

spondent's probation is thirty-one (31) days from the date of this order.

2. **DANIEL R. ROSEN SHALL** pay the costs of these proceedings. The People shall submit a Statement of Costs within fifteen (15) days from the date of this Order. Respondent shall have ten (10) days thereafter to submit a response.