**The PEOPLE of the State of Colorado, Complainant,**

v.

**Alan David ROSENFELD, Respondent.**

**No. 06PDJ094.**

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

Nov. 21, 2007.

On June 19, 2007, a Hearing Board composed of ROBERT A. MILLMAN and EDWIN S. KAHN, both members of the Bar, and WILLIAM R. LUCERO, the Presiding Disciplinary Judge ("the PDJ"), held a hearing pursuant to C.R.C.P. 251.18. Kim E. Ikeler appeared on behalf of the Office of Attorney Regulation Counsel ("the People") and Alan D. Rosenfeld ("Respondent") appeared *pro se*. The Hearing Board previously issued an "Opinion and Order Imposing Sanctions pursuant to C.R.C.P. 251.19" on August 24, 2007.

### AMENDED OPINION AND ORDER IMPOSING SANCTIONS PURSUANT TO C.R.C.P. 251.19(b)

The PDJ received "Respondent's Motion for Post Trial Relief" on October 3, 2007. The People filed a response on October 5, 2007.[1] The PDJ consulted with the Hearing Board on the matters presented in Respondent's motion and now **GRANTS IN PART AND DENIES IN PART** the motion as set forth in the following "Amended Opinion and Order Imposing Sanctions Pursuant to C.R.C.P. 251.19(b)."

### I. *ISSUE/SUMMARY*

■ Suspension is generally appropriate when a lawyer *knowingly* fails to perform services for clients and causes injury or potential injury.[2] Respondent failed to complete discovery and failed to adequately communicate with his clients. As a result of Respondent's lack of diligence, the trial court entered a default judgment against his clients. Is suspension appropriate even if there is significant evidence in mitigation?

From the outset of the People's investigation, Respondent admitted violations of Colo. RPC 1.3 and 1.4 (failure to act with reasonable diligence and promptness in representing a client and failure to keep a client reasonably informed about the status of a matter). In addition to Respondent's admitted misconduct, the Hearing Board finds that Respondent violated: Colo. RPC 1.16(a) (a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if the representation will result in a violation of the rules of professional conduct) as charged in Claim IV; Colo. RPC 3.4(c) (a lawyer shall not knowingly disobey an obligation under the rules of a tribunal) as charged in Claim V; and Colo. RPC 3.4(d) (a lawyer shall not fail to make a reasonably diligent effort to comply with a legally proper discovery request by an opposing party) as charged in Claim VI.

The Hearing Board does not find clear and convincing evidence that Respondent violated: Colo. RPC 1.7(b) (a lawyer shall not represent a client if the representation of that client will be directly adverse to another client) as charged in Claim III; Colo. RPC 3.5(c) (a lawyer shall not engage in conduct *intended* to disrupt a tribunal) as charged in Claim VII; or Colo. 8.4(d) (a lawyer shall not engage in conduct that is prejudicial to the administration of justice) as charged in Claim VIII.

***SANCTION IMPOSED:* ATTORNEY SUSPENDED FOR SIX (6) MONTHS, ALL STAYED UPON THE SUCCESSFUL COMPLETION OF A ONE (1) YEAR PERIOD OF PROBATION, WITH CONDITIONS.**

### II. *PROCEDURAL HISTORY*

On November 22, 2006, the People filed a Complaint with eight separate claims related

---

1. The PDJ also **DENIES** "Complainant's Motion to Strike Respondent's Motion for Post–Trial Relief" filed October 5, 2007, and **GRANTS** "Respondent's Motion for an Extension of Time for Filing of His Motion for Post–Trial Relief" filed October 10, 2007.

2. "Knowledge" is the conscious awareness of the nature or attendant circumstances of the conduct *but without the conscious objective or purpose to accomplish a particular result.* ABA *Standards,* Definition.

to Respondent's representation of three clients in a civil proceeding. Respondent filed an Answer on December 26, 2006. He also filed three separate motions for judgment on the pleadings. On May 15, 2007, the PDJ heard oral argument from the parties on each of Respondent's motions for judgment on the pleadings. The PDJ denied Respondent's first, second, and third motions for judgment on the pleadings on May 18, 2007.

## III. FINDINGS OF MATERIAL FACT

The Hearing Board finds that the following facts have been established by clear and convincing evidence.[3]

### Jurisdiction

Respondent has taken and subscribed the oath of admission, was admitted to the bar of the Colorado Supreme Court on November 23, 1998, and is registered upon its official records, Attorney Registration No. 30317. He is therefore subject to the jurisdiction of the Hearing Board and the PDJ in these disciplinary proceedings pursuant to C.R.C.P. 251.1(b). Respondent's registered business address is 368 S. McCaslin Blvd., Suite 131, Louisville, CO 80027–9432.

### Events Leading to Respondent's Representation of BV and Her Family

On February 25, 2003, BV's former husband RM, sued BV, BV's aunt DW, BV's mother Betty V, and father AV (the civil case). RM alleged that BV and her family entered into a conspiracy to interfere with RM's custody of Diane, the only child born to RM and BV during their marriage. RM also alleged outrageous conduct, civil conspiracy, and violation of the Colorado Organized Crime Control Act against BV and her family. The events leading up to this civil lawsuit include the following:

- On May 9, 2000, RM and BV were divorced. The parties stipulate that these proceedings were acrimonious. Ultimately, the court awarded the majority of parenting time and decision making

authority concerning Diane to RM, not BV.

- On or about April 15, 2001, in contravention of the divorce court's order concerning parenting time and without RM's knowledge or consent, BV fled to Costa Rica with Diane.
- BV was arrested in Costa Rica and was brought back to Colorado approximately one year after she fled Denver with Diane. BV was charged in federal court with forging a passport for herself and Diane. On February 25, 2003, the federal court sentenced BV to twelve months and one day imprisonment. Respondent did not represent BV on the federal charges.
- Following her conviction in federal court, state prosecutors brought charges against BV based upon the passports she forged, criminal impersonation, and violation of a child custody order all arising out of BV's flight to Costa Rica with Diane. On March 17, 2003, BV was convicted of forgery of a government document, two counts, and a single count of criminal impersonation. However, the jury found BV *not guilty* of violation of a child custody order. The state court sentenced her to five years probation. Respondent represented BV in this case.

### Respondent Enters an Appearance in the Civil Case, 03CV1363

RM filed his civil suit against BV and her family on February 25, 2003. In June 2003, Respondent substituted as counsel for BV and entered his appearance for BV's aunt DW.

### Respondent Fails to Answer Discovery

On September 20, 2004, RM propounded interrogatories to DW. Respondent failed to answer these interrogatories. On January 10, 2005, RM moved to compel. Again, Respondent failed to respond. Further, Respondent failed to inform DW that the motion had been filed. On February 1, 2005, the trial court granted RM's motion to

3. The parties stipulated to facts numbered 1–30 in the Trial Management Order approved by the

PDJ. The stipulated facts have been incorporated into the Hearing Board's findings of fact.

compel and awarded him fees. Once again, Respondent failed to respond to the trial court.

On February 10, 2005, RM propounded a second set of discovery requests to BV and DW.[4] BV was aware of these requests and assumed Respondent was taking care of them. Respondent did not serve responses to RM on this second set of interrogatories.

On March 31, 2005, RM moved for sanctions based on Respondent's failure to respond. Before issuing any sanctions, the trial court judge instructed her clerk to contact Respondent and remind him that he had not yet filed responses to RM's request for discovery or the court's order to compel.

Finally, on June 10, 2005, after Respondent failed to respond to the clerk's calls, the trial court entered default judgment against BV and DW as to liability on *all* of RM's claims. On July 13, 2005, the trial court ordered BV, DW, and Respondent to pay RM within ten days the costs incurred in pursuit of the interrogatories in the amount of $437.50. Respondent did not pay the costs within ten days as ordered by the trial court. Although there was no evidence presented on this issue in these proceedings, the parties now agree that Respondent ultimately paid the court ordered costs in December 2005.

### Trial Management Order

On February 6, 2006, RM and defendants Betty V and AV (BV's mother and father) filed a proposed Trial Management Order ("TMO"). Respondent did not participate in the drafting of the TMO on behalf of BV and DW. Respondent was aware of the deadline the trial court had set for the TMO, but he was trying a case in Fairbanks, Alaska at that time. Therefore, Respondent sought an extension of time from counsel for RM to participate in the TMO. RM's counsel did not agree to an extension and filed the TMO without Respondent's participation. By this time in the proceedings, the relationship between Respondent and counsel for RM was strained. One of RM's counsel testified that she and co-counsel felt all communication

with Respondent needed to be in writing in order to protect their client's interests.

On February 22, 2006, Respondent filed a motion asking permission to file a supplement to the TMO. The trial court denied this motion at the pre-trial conference on February 24, 2006.

### Motion in Limine

On January 30, 2006, RM moved *in limine* to bar admission of certain evidence in the civil case. At the pretrial conference, Respondent entered his appearance on behalf of *all the defendants but AV,* BV's father.

On February 27, 2006, the trial court granted RM's motion *in limine* in part and ruled that the following evidence would be excluded:

- Evidence of the relationship between RM and BV;
- The reasons for their divorce;
- The sexual relations between RM and BV;
- Evidence of the personal ads RM allegedly placed in a local newspaper;
- Evidence of sexual harassment allegations against RM at his place of employment;
- Evidence of *allegations that RM's father was a pedophile;*
- Evidence of *allegations of RM wiretapping Betty V;* and
- Evidence *that a jury found BV not-guilty in Jefferson County of charges of violation of a child custody order.*

### Respondent's Motion to Reconsider the Order of Default

Respondent filed a motion asking the trial court to reconsider its order of default against DW and BV. Respondent's argued that he alone was responsible for the failure to provide discovery to RM. In his pleadings and subsequent testimony on this issue, he characterized his conduct as "gross incompetence." On March 3, 2006, after hearing

---

**4.** Counsel for RM testified that his interrogatories were an attempt to determine the basis for

BV's affirmative defense of necessity.

the testimony of DW and Respondent, the trial court denied the motion for reconsideration. The trial court found Respondent's, BV's and DW's testimony incredible and testified in these proceedings that she believed Respondent's failure to answer discovery was a *tactical decision* in which BV and DW agreed, as opposed to a situation in which unwitting clients were at the mercy of an incompetent lawyer.

### Trial Court Conducts Inquiry of Defendants as to Conflict

 On the first day of trial, RM's counsel objected to Respondent's entry of appearance on behalf of all defendants. In open court, the trial judge asked each of the defendants whether they understood the import of Respondent representing all of them in the case. She pointed out that they had "divergent interests" and that they did not share the same level of alleged culpability as BV based upon facts charged in the complaint. Each defendant individually stated that they understood, but nevertheless each decided to continue with Respondent as counsel.[5]

Furthermore, the lawyer representing Betty V and AV agreed that Respondent should be allowed to concurrently represent Betty V. And the lawyer who previously represented DW in the motion to set aside the default judgment entered against DW and BV, agreed with Respondent's entry of appearance on behalf of DW.

### Trial Court Allows Respondent to Represent BV, DW, and Betty V

The trial judge allowed Respondent to represent BV, DW, and Betty V after assuring herself that they understood the conflict and possible implications of proceeding to trial with the same attorney.[6] At the hearing, the trial judge forewarned counsel not to make comments during opening statement about any evidence that had been stricken or evidence excluded in the trial court's *in limine* order. Finally, the trial judge stated, *"everybody is going to play by the rules from here on out, right."* Respondent assured the

trial court that he would do so and would approach the bench first before pursuing a line of questioning in front of the jury, which might be "opened up" as the trial progressed.[7]

### Plaintiff's Objections to Improper Closing Argument

 During his closing argument, Respondent drew objections from RM's counsel. The words and conduct of Respondent that drew these objections form the basis for the People's allegation that Respondent intended to disrupt the trial court and that he engaged in conduct prejudicial to the administration of justice. The *first* objection dealt with Respondent's comment to the jury that "some rules simply need to be broken." RM's counsel objected and the trial court sustained the objection. The trial judge, as well as RM's counsel, testified that they believed that this comment invited the jury to ignore the trial court's instructions of law.

Before arguing, "some rules need to be broken," Respondent argued that if a passerby hears a child screaming from a house that is on fire, he may break down the door and save the child. But if a passerby would break into a house without the need to save a child, the passerby could be charged with burglary. This comment did not draw an objection. Respondent testified that his reference *to breaking rules* was a reference to the *necessity defense* he offered on behalf of Betty V, and not an effort to disparage the trial court's instruction or rules.

The *second* argument that forms the basis for the People's contention that Respondent intended to disrupt the proceedings and prejudice the administration of justice concerned Respondent's reference to the fact that BV had only been convicted of two counts of forgery and a single count of criminal impersonation. In making this argument Respondent held a chart in front of the jury that read two plus two equals four. The trial court viewed this argument as an attempt to indirectly inform the jury that BV had been

5. Exhibit 88, pages 20–22.

6. Exhibit 88, page 21 and 22.

7. Exhibit 88, page 22.

acquitted of violation of a child custody order in the state criminal case against BV, a matter the trial court previously ruled inadmissible in its *in limine* order.[8]

### The Jury's Verdict

On March 9, 2006, the jury returned a verdict in RM's favor and against BV, DW, Betty, and AV jointly and severally in the total amount of $420,000.00. The jury found for RM and against the three defendants on the claims of interference with parent-child relationship, outrageous conduct, and civil conspiracy. The jury apportioned fault as follows: 86% to BV, 7% to DW, and 7% to Betty. The jury's finding of a civil conspiracy, however, rendered all defendants jointly and severally responsible for the entire judgment.[9] On May 10, 2006, the trial court amended the judgment to add interest and court costs, for a total judgment of $599,032.16.[10]

### IV. CONCLUSIONS OF LAW—SUBSTANTIVE ALLEGATIONS

### Claim I

Respondent admitted his violation of Colo. RPC 1.3 (a lawyer shall act with reasonable diligence and promptness in representing a client and shall not neglect a legal matter entrusted to him). Based upon the evidence presented, the Hearing Board finds clear and convincing evidence that Respondent repeatedly neglected filing answers to interrogatories that called upon BV and DW to disclose any evidence that supported their affirmative defense of necessity. Respondent also neglected filing answers to interrogatories on behalf of DW individually. *At a minimum,* in Respondent's own words, he was grossly incompetent in failing to properly answer discovery requests and ignoring the trial court's order to compel, all of which resulted in the trial court ordering a default against BV and DW.[11]

### Claim II

Respondent also admits his violation of Colo. RPC 1.4(a) and (b) (a lawyer shall keep a client reasonably informed about the status of a matter, promptly comply with reasonable requests for information, and explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation). The Hearing Board finds clear and convincing evidence that Respondent failed to keep his clients informed about the necessity of answering the RM's interrogatories and the potential for default if they did not. As a direct result of Respondent's failure to provide discovery and advise his clients, the trial court later entered default, which deprived BV and DW of their ability to present a defense of necessity to the jury on the merits of the case.

### Claim III

Colo. RPC 1.7(b) states:

a lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless

(2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

(c) for purposes of this Rule, *a client's consent cannot be validly obtained in those instances in which a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances of the particular situation* (emphasis added).

The Hearing Board finds that the evidence supporting RM's claims against BV's family was circumstantial and less compelling than

---

**8.** Respondent argued in these proceedings that RM had introduced evidence that BV had been charged with violation of a custody order in the state case.

**9.** C.R.S. § 13–21–111.5(4).

**10.** The record does not demonstrate what part, if any, of the damages awarded were punitive.

**11.** The trial court ultimately came to the conclusion that Respondent's actions in this matter were calculated and not negligent.

the evidence against BV. The undisputed facts show that BV took Diane to Costa Rica in violation of the divorce court's order granting RM the majority of parenting time to RM. The evidence against the family, on the other hand, was indirect and focused on alleged support and assistance they provided BV after she fled to Costa Rica. Respondent offered a defense of necessity as to BV, DW, and Betty V and at the same time argued the lack of strong evidence against the family. However, Respondent did not argue that BV was primarily responsible for violating the court's order concerning parenting time with Diane. The evidence presented here shows the family did not know BV left the United States with Diane, until BV called DW from Costa Rica.[12]

Another lawyer may have convinced the family members that pointing the finger of blame at BV would have been a better defense for them. However, the family was presented a Hobson's choice: either cooperate with law enforcement and disclose their daughter's whereabouts; or not cooperate and face the possibility of violating the law.

Instead of arguing BV's greater culpability, Respondent took the tactic of synthesizing both defenses: necessity and lack of culpability on the part of the family. Respondent believed his tactic was neither inconsistent nor harmful to either BV or her family in spite of fact that BV and DW defaulted and thereby lost their ability to argue on the merits that there was necessity.

Conversely, representing all three of these defendants made it easier for RM to argue that the family *acted in concert*, not only when BV took Diane to Costa Rica, but also in the civil proceedings as evidenced by Respondent's common representation of BV, DW, and Betty V. Thus, the Hearing Board finds clear and convincing evidence that DW's and Betty's defense was *materially limited* by Respondent's representation of BV.

But such a conflict may be waived if *(1) the lawyer reasonably believes the representation will not adversely affect the relationship* with the other client, and (2) the clients consent to common representation after consultation. Colo. RPC 1.7. The evidence shows that Respondent and co-counsel advised BV, DW, and the family of the implications of common representation, how it could affect their defense, and the risks that might result from Respondent representing all of them. Further, the trial court made inquiry of all of the defendants about the implications of common representation and the risks involved therein. After the trial court made this inquiry, it was satisfied that Respondent could represent BV, DW, and Betty V. Furthermore, the lawyers representing Betty V and DW agreed that Respondent should be allowed to represent BV and DW after consulting with these clients. Based upon this record, the Hearing Board finds that Respondent reasonably believed that any conflict was waived.

Nevertheless, the People argue that *a disinterested lawyer would conclude that the client should not agree to waiver and therefore consent cannot be validly obtained.* Colo. RPC 1.7. Indeed, choosing separate counsel for each of BV's family members would have been the wiser choice. But this observation is made with the benefit of hindsight. Even though an expert offered by the People opined that he would have counseled these clients to obtain separate counsel and would not have allowed Respondent to continue representing them, another counsel might equally find that the consent was valid given the totality of circumstances. Indeed, the trial court found BV, DW, and Betty V waived any conflict. There is no doubt that the better practice would have been to obtain separate counsel for each of the family members. But it is unlikely that any lawyer, independent or otherwise, could have affected the choice the family made to allow Respondent to represent them.

### Claim IV

The People alleged that Respondent should have withdrawn as counsel because his family medical crisis left him with insuffi-

---

12. The evidence that the family aided BV after they discovered she was in Costa Rica included their failure to advise the FBI and local authorities of BV's whereabouts.

cient time to attend to the civil litigation involving BV and her family, with the result that default was entered against his clients. We agree. As Respondent testified in these proceedings, he was "overwhelmed" with the tasks that faced in representing his clients in a complex civil case due in part to his other commitments, including a trial in Fairbanks, Alaska and his father's death.

### Claim V

The evidence is also clear and convincing that Respondent failed to obey the trial court's order in a timely manner. The trial court ordered that he pay the costs RM incurred in obtaining a default judgment against BV and DW. No evidence was presented that showed Respondent asked the court for additional time to pay these costs. He simply ignored the order for five months.

### Claim VI

For the reasons stated above in the analysis of Claim I, the Hearing Board finds clear and convincing evidence that Respondent violated Colo. RPC 3.4(d) by failing to comply with a proper discovery request from plaintiff's counsel.

### Claim VII

The Hearing Board does not find clear and convincing evidence that Respondent *intended* to disrupt a tribunal in violation of Colo. RPC 3.5(c). While Respondent's conduct as a whole during final argument raised a valid concern on the part of the trial judge about his professionalism and ethics, the evidence falls short of clear and convincing that Respondent's principal objective in making the offending remarks was to disrupt the proceedings. In order to prove intent, the People must prove by clear and convincing evidence that it was Respondent's *conscious objective* to disrupt the tribunal. After reading the transcript and listening to the audiotape presented in these proceedings, the Hearing Board does not find Respondent specifically intended to disrupt the court proceeding. *See Matter of Attorney C,* 47 P.3d 1167, 1173 (Colo.2002) and *In re Roose,* 69 P.3d 43, 49 (Colo.2003).

### Claim VIII

While Claim VIII presents a close question, the Hearing Board does not find by clear and convincing evidence that Respondent engaged in conduct prejudicial to the administration of justice in violation of Colo. RPC 8.4(d) based upon *his conduct during closing argument* as specifically charged in the People's complaint.

The trial court was appropriately concerned that Respondent's comments in final argument appeared to be in violation of its *in limine* order and presented the prospect of a mistrial and/or arguing inadmissible evidence to the jury. Furthermore, the content and delivery of his final argument was clearly an effort to convince the jury that BV was justified in taking her child to Costa Rica. Yet, Respondent's failure to provide discovery and the resulting entry of default diluted such an argument on the merits. It appears that Respondent was desperately trying to make up for the ground he previously lost due to his lack of diligence.

■ As stated in *Edwards v. Sears, Roebuck and Co.,* 512 F.2d 276, 283(5th Cir. 1975):

> Courts usually permit reasonable latitude in counsel's final arguments to the jury. Proficiency in jury argument, an ability to sway doubtful minds, a method of convincing others of the rightness of one's positions are important not only to successful advocacy but also to effective representation of the client's interests. *But advocacy is circumscribed both by an attorney's own professional responsibility and the court's obligation to provide the parties a fair trial* (emphasis added).

Respondent failed to approach the bench before making comments in front of the jury that might have been in violation of the trial court's admonitions, although he assured the court that he would do so. It was Respondent's last volley that causes this Hearing Board the most concern. After numerous rebukes from the trial court and an admonition to sit down, Respondent returned to his table, raised his hand in what the court interpreted as further defiance of its final order

and stated, "Don't give that man a dime, don't give that man a dime."

After listening to the audiotape of this comment and considering the various interpretations given to this comment by witnesses in the courtroom at the time, the Hearing Board does not find clear and convincing evidence that Respondent engaged in conduct prejudicial to the administration of justice *solely as to his conduct during his final argument.* While Respondent vigorously advanced his client's cause, he also offended the dignity of the court and came dangerously close to violating Colo. RPC 8.4(d), engaging in conduct prejudicial to the administration of justice.

## V. SANCTIONS

The American Bar Association *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992) ("ABA *Standards* ") and Colorado Supreme Court case law are the guiding authorities for selecting and imposing sanctions for lawyer misconduct. *In re Roose,* 69 P.3d 43, 46–47 (Colo.2003).

### Analysis Under the ABA Standards

ABA *Standards* 3.0 directs the Hearing Board to first consider the duty breached, the mental state of the lawyer, the injury or potential injury caused, and the aggravating and mitigating evidence in determining the appropriate sanction for lawyer misconduct.

■ Generally, sanctions are more severe when there is great injury or potential injury to the judicial system and the lawyer acts with a conscious objective to disrupt proceedings. For example, disbarment is generally appropriate when a lawyer knowingly violates a court order with *the intent to obtain a benefit for himself or his client* and causes serious injury or potential injury to the judicial proceedings. ABA *Standards* 6.21.

■ Suspension, on the other hand, is generally appropriate when a lawyer knowingly violates a court order and causes injury or potential injury to a client, party, or interference or potential interference with a legal proceeding. ABA *Standards* 6.22.

### The Duty Violated

■ Respondent violated duties to his clients and the legal profession when he failed to answer interrogatories that were reasonably related to the claimed defense of necessity and when he continued to represent clients when he did not have time to adequately prepare their defense. Respondent also violated his duty to the trial court by failing to answer its inquiries and later an order to compel. "Attorney misconduct perpetuates the public's misperception of the legal profession and breaches the public and professional trust." *In re DeRose,* 55 P.3d 126, 131 (Colo.2002) (paraphrasing *In re Pautler,* 47 P.3d 1175, 1178 (Colo.2002)).

### Respondent's Mental State

According to the ABA *Standards Definitions,* "knowledge is the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." Here, Respondent acted with awareness when he failed to comply with discovery requests and the trial court's order compelling the same, failed to advise his clients of the seriousness of the matter, and failed to withdraw from the case given his inability to diligently prepare for trial given his personal and professional commitments. There is insufficient evidence that Respondent fully understood the consequences of his conduct, but that is not a necessary element of knowing conduct.

### The Actual or Potential Injury

Respondent's lack of diligence and his failure to keep his clients informed as to the progress of the case directly contributed to a *substantial* judgment against all of his clients jointly and severally. While the Hearing Board does not find clear and convincing evidence that Respondent intended to disrupt a court proceeding or violated his loyalty to BV, DW, and Betty V, *his conduct as a whole* brought disrepute to the judicial process.

Ultimately, Respondent's pattern of conduct not only harmed his clients, it also harmed the legal profession. Although Re-

spondent claims to zealously and passionately represent his clients, he did not do so here. Zealous representation, as the term is used in the Colorado Rules of Professional Conduct, means that the lawyer acts competently, tirelessly, and diligently on behalf of his clients *within the law as well as the Colorado Rules of Professional Conduct.* This record shows Respondent did not.

### Aggravating and Mitigating Factors

The Hearing Board considered evidence of the following aggravating circumstances in deciding the appropriate sanction to impose. Aggravating circumstances are any considerations, or factors that may justify an increase in the degree of discipline imposed. ABA *Standards* 9.21.

**Pattern of Misconduct/Multiple Offenses—9.22(c) & (d).** The Hearing Board finds that Respondent engaged in a pattern of misconduct by failing to follow reasonable requests for discovery, the trial court's orders, and failing to recognize that he was not prepared for trial, all of which seriously harmed his clients.

**Vulnerability of the Victim—9.22(h).** Although BV is not a victim as that term is used in most contexts, BV was a vulnerable client. BV sings Respondent's praises and does not appreciate the harm Respondent caused her by his lack of diligence. Respondent was the only lawyer who would listen to her and fought to protect her interests as well as her daughter, Diane. Respondent is well aware of the admiration BV and other clients similarly situated have for him. Further, Respondent knows that BV suffers from post-traumatic stress syndrome following a tumultuous relationship with her husband.

**Substantial experience in the law—9.22(i).** Respondent has practiced law in Vermont and Colorado for over twenty years and has specialized in representing women in domestic disputes throughout his career.

The Hearing Board also considered evidence of the following mitigating circumstances in deciding what sanction to impose. Mitigating circumstances are any considerations, or factors that may justify a reduction in the degree of discipline imposed. ABA *Standards* 9.31.

**Absence of a Dishonest or Selfish Motive—9.32(b).**

The Hearing Board agrees with the trial court's finding that Respondent's conduct was purposeful, but finds that it was not dishonest or selfish. In his zeal to represent a woman he thought to be wrongfully accused, Respondent failed to recognize that his conduct harmed rather than assisted BV and her family.

**Personal or Emotional Problems—9.32(c)**

Shortly before the civil trial, Respondent's father died from cancer after suffering from the disease for an extended period of time. There is no question that as a result of his father's illness and subsequent death, Respondent suffered and continues to suffer substantial emotional pain. The Hearing Board recognizes this as a mitigating factor. However, the Hearing Board also notes that Respondent's father's death occurred shortly before the civil trial. Respondent's lack of diligence in the civil case started over a year before his father's death. Furthermore, while his father's illness and subsequent death may help explain Respondent's failure to withdraw from a case in which he was admittedly overwhelmed, it does not mitigate his conduct in going forward in a complex case without proper preparation.

**Cooperative Attitude Toward These Proceedings—9.32(e).** The evidence shows Respondent cooperated with the People in these proceedings and fully and freely disclosed *many* of the alleged facts as well as rule violations charged in Claims I, II, and VI.

**Remorse—9.32(*l*).** Respondent immediately acknowledged his misconduct in failing to respond to a request for discovery and the trial court's orders when the People commenced their investigation. Further, Respondent *testified in these proceedings* that he is remorseful for the harm he caused his clients, the profession, *and the court.* However, when Respondent failed to honor the trial court's order to compel and later failed to timely pay

costs as ordered, his present claim of remorse, *as it relates to the trial court,* must be reviewed in context.

**Good Character and Reputation—9.32(g)**

Respondent presented evidence from BV and other former clients who praised his work as a compassionate, caring, and effective advocate. Respondent also testified that he is an honest and reputable attorney. Furthermore, counsel who represented BV's parents and aunt confirmed that Respondent was an effective and knowledgeable attorney and therefore agreed to his representation of DW and BV's mother and father in the civil case. While the Hearing Board considered this testimony in mitigation, it notes that this evidence is less than "substantial" evidence of good character and reputation as Respondent characterizes it.

*Analysis Under Case Law*

When a lawyer fails to act diligently in his responsibilities to his clients and causes injury or potential injury, the Colorado Supreme Court has approved a sanction of suspension. In *People v. Rishel,* 956 P.2d 542 (Colo.1998) the Supreme Court, citing ABA *Standards* 4.42, suspended an attorney for one year and one day after finding violations of Colo. RPC 1.3 and 1.4. However, in *Rishel,* the lawyer effectively abandoned two clients. Here, Respondent did not abandon his clients. Nevertheless, his failure to act diligently on their behalf caused BV and DW to suffer a default judgment.

The presumption of suspension under the ABA *Standards,* as well as the case law, demonstrates that a suspension is appropriate. However, each case is unique and calls for an analysis based upon all the facts presented. The Colorado Supreme Court has cautioned Hearing Boards to carefully weigh any mitigating factors that might overcome what might otherwise be the presumed sanction of disbarment. *In re Fischer,* 89 P.3d 817 (Colo.2004).

While Respondent presented several matters in mitigation, those factors do not sufficiently overcome the presumptive sanction of suspension in light of totality of factors we must consider: Respondent's state of mind, the duty he breached, and most importantly the *serious injury* his conduct caused his clients. Thus, the Hearing Board finds that a six-month suspension, stayed upon the successful completion of a one-year period of probation, is appropriate under these circumstances.

Respondent, nevertheless, strenuously argues that he should receive no greater sanction than a public censure and cites *People v. Kram,* 966 P.2d 1065 (Colo.1998) as authority for his position. Kram, he points out, lied to his clients and Respondent did not. Respondent also argues that, like Kram, he experienced emotional distress, a mitigating factor that the Colorado Supreme Court in *Kram* noted was "significant."

However, the Hearing Board finds that the emotional and personal problems Respondent presented here, while mitigating, do not, change our view that a public censure would unduly minimize the seriousness of Respondent's conduct. The Hearing Board also lists the following significant differences between Kram's conduct and that of Respondent:

- Unlike Kram, there is no evidence that Respondent, recognizing the seriousness of his misconduct, advised his clients about reporting his misconduct to the Office of Attorney Regulation or whether he carried malpractice insurance;

- Unlike Kram, there is no evidence that Respondent offered to make monetary restitution to his clients;

- Unlike Kram, Respondent's lack of diligence caused serious injury *to multiple clients;* and

- Unlike Kram, Respondent's harm to his clients continued after acknowledging a failure to file appropriate answers to discovery as the court ordered. Respondent's preparation for trial was harried at best. We have found that Respondent did not violate Colo. RPC 1.7 (conflict of interest) by clear and convincing evidence because of his client's waiver after the matter was brought to the trial court's attention. But there is no doubt that his decision to charge headlong into a complex trial representing multiple clients with varying degrees of culpabili-

ty was predictably hazardous and injurious to them. Instead of minimizing the harm he initially caused, Respondent knowingly increased the risks his clients faced when he proceeded to trial without adequate preparation.

Finally, looking at Respondent's misconduct as a whole, more than a public censure is warranted. Respondent has and will continue to represent clients who are not likely to exercise independent or objective judgment. Instead, they are vulnerable to excusing or ignoring professional performance, which does not meet reasonable standards. The facts in this case demonstrate that such clients are not inclined to see how Respondent's blunders affect them. Nevertheless, the fact that Respondent's clients see him as a compassionate, effective, and zealous in their cause, does not excuse his conduct here.

Thus, while Respondent cites *Kram* as authority for the proposition that he should receive a public censure, the Hearing Board finds that Respondent's pattern of misconduct, serious injury he caused to multiple clients, and his disregard for court orders warrant greater discipline than a public censure.

## VI. CONCLUSION

Respondent's conduct was ill advised, misguided, and unethical. We find that Respondent was aware that he was in violation of the trial court's order compelling him to make discovery available to RM's counsel. He was also aware that he failed to obey the trial court's order to pay RM's costs in ten days for the cost in litigating the motion to compel. However, we do not find clear and convincing evidence that Respondent *intended* to disrupt the proceedings. If it was Respondent's intent to sabotage the proceedings in order to gain an advantage for his clients, he could not have failed more miserably. Nevertheless, we see a pattern of misconduct that must be corrected in order to protect the public. The Hearing Board finds that a suspension with conditions will meet this need.[13]

---

13. The Hearing Board recognizes that supervising Respondent will be difficult given the nature of his practice and the fact that he frequently

## VII. ORDER

The Hearing Board therefore **ORDERS**:

1. ALAN DAVID ROSENFELD, Attorney Registration Number 30317, is **SUSPENDED** from the practice of law for a period of **SIX (6) MONTHS, ALL STAYED** upon the successful completion of a **ONE (1) YEAR** period of probation with conditions, effective thirty-one (31) days from the date of this order. As a condition of his probation, Respondent **SHALL NOT** engage in further violations of the Colorado Rules of Professional Conduct or the rules of professional conduct in any other jurisdiction. Respondent **SHALL** submit to a practice monitor for the duration of his probation selected by the People and pay the cost of such monitoring. The monitor shall physically meet with Respondent on a monthly basis and report quarterly to the People on Respondent's progress as it relates to meeting deadlines and management of workload. The monitor shall have access to all pleadings in Respondent's cases as well as other non-confidential material information. Respondent is not required to report to clients that he is being monitored, but shall otherwise abide by all the rules of procedure in attorney regulation matters. *See* C.R.C.P. 251 *et al.*

2. ALAN DAVID ROSENFELD, **SHALL** pay the costs of these proceedings as previously ordered by the PDJ on October 10, 2007.

practices law outside the State of Colorado. Nevertheless, Respondent admits that he is not well organized and has no staff to assist him.